IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL NO. 91-00137 |
| | ) | DAE-KSC |
| Plaintiff, | ) | |
| | ) | ELEVENTH REPORT AND |
| vs. | ) | RECOMMENDATION; |
| | ) | EXHIBITS "A" – "D" |
| STATE OF HAWAI'I, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ELEVENTH REPORT AND RECOMMENDATION

This Eleventh Report and Recommendation (1) updates the status of the case related to the Special Master's Plan for Community Mental Health Services, (2) explains the Joint Stipulation and Order Regarding Plan for Community Mental Health Services and (3) discusses the sixth visit of the Special Master's Community Mental Health Services Evaluation Team on December 5-9, 2005.

The Community Plan

A detailed overview of the Special Master's Plan for Community Mental Health Services ("Community Plan")

is set out in the Special Master's Tenth Report and Recommendation ("Tenth Report") filed on July 20, 2005.

Reports and detailed discussion concerning Defendants' progress or lack thereof to achieve substantial compliance with the Community Plan are set out in the Fourth, Seventh, Eight, Ninth and Tenth Reports and Recommendations filed by the Special Master on July 18, 2003, August 26 and November 12, 2004, and February 9 and July 20, 2005, respectively.

Although entitled the Special Master's Plan for Community Mental Health Services, the Community Plan was the result of a collaborative effort by counsel, representatives of the parties and Kris McLoughlin, the court appointed Special Monitor, along with Thomas Hester, M.D., Chief of the Adult Mental Health Division.  The meetings and discussions which lead to formulation of the Community Plan took place in Honolulu and Washington, D.C., during the fall of 2002.

The Community Plan was presented as part of the Special Master's Third Report and Recommendation filed

2

on November 27, 2002, and was approved and adopted as an Order of the Court by Chief District Judge Ezra on January 23, 2003.

The deadline for Defendants' compliance with the Community Plan was originally January 23, 2005.  On December 10, 2004, the twenty-four month period allowed for Defendants' compliance with the Community Plan was increased by seventeen months and Defendants' deadline was extended to June 30, 2006.

In the Tenth Report filed on June 20, 2005, the Special Master expressed apprehension and doubt as to whether Defendants are likely to meet the June 30, 2006 compliance deadline.

<u>The Joint Stipulation</u>

On October 26, 2005, Chief District Judge Ezra approved a Joint Stipulation And Order Regarding Plan For Community Mental Health Services ("Joint Stipulation") in this case.

The Special Master and Kris McLoughlin, the court appointed Special Monitor, encouraged and supported the

3

proposed Joint Stipulation reached by the parties because it (1) recognizes Defendants' progress and substantial compliance with the Hawaii State Hospital Remedial Plan, (2) promotes the efficient use of available resources and the provision of community based mental health services to consumers, (3) contemplates a more collaborative approach to Defendants with the Special Monitor and Evaluation Team members offering technical assistance to Defendants, (4) obligates Defendants to put forth their reasonable best efforts towards achieving substantial compliance, (5) provides the best opportunity for Defendants to achieve substantial compliance with the Community Plan by June 30, 2006, and (6) brings closure to this costly and very challenging fifteen year old lawsuit based on the Civil Rights of Institutionalized Persons Act ("CRIPA").

In pertinent part, the Joint Stipulation provides the following.

First, Defendants' deadline for compliance with the

Community Plan remains June 30, 2006.

Second, Defendants shall prepare an Action Plan with timelines which sets out the particular steps Defendants will take to achieve substantial compliance with the Community Plan.  Third, the United States, Defendants, the Special Monitor and the Evaluation Team members shall collaborate on the implementation of Defendants' Action Plan.

Fourth, Defendants shall put forth their reasonable best efforts to achieve substantial compliance with the Community Plan and all previously entered court orders related to the Community Plan.

Fifth, in the event that Defendants have not achieved substantial compliance with the Community Plan by June 30, 2006, Defendants shall continue their efforts to implement the Community Plan until on or before November 30, 2006.  Finally, this lawsuit will terminate on November 30, 2006.

The Evaluation Team's Sixth Site Visit

Kenneth Minkoff, M.D., Gail Hanson-Mayer, A.P.R.N.,

5

B.C., M.P.H. and Paul Gorman, Ed.D. comprise the Special Master's Community Evaluation Team ("Evaluation Team").

The sixth community site visit by the Evaluation Team took place on December 5-9, 2005.  Copies of the written reports submitted by Dr. Minkoff, Ms. Hanson-Mayer and Dr. Gorman are attached to this Eleventh Report as Exhibits "A", "B" and "C", respectively.

Overall, the Evaluation Team noted "promise" and "potential" based on recent personnel and other changes made at the Adult Mental Health Division, Department of Health ("AMHD").  During their sixth visit, the Evaluation Team encountered a different organizational structure at AMHD, new staff hired to fill vacant AMHD positions, a changed internal AMHD action plan, and as of November 30, 2005, a new Community Plan implementation extension time line.

The Evaluation Team also described areas of the Community Plan in which Defendants showed significant progress.  These areas included: (1) describing and

6

reporting on the target population, (2) implementation of an array of community housing services, (3) implementation of psychosocial rehabilitation services, and (4) implementation of a service research and evaluation system.

However, the Evaluation Team also found that Defendants have still not made meaningful progress to achieve substantial compliance in the following critical areas of the Community Plan: (1) development and implementation of community-based forensic services, (2) AMHD inpatient discharge oversight, and (3) development of an AMHD functional organizational chart as described in the Community Plan.  The subject of community based forensic services and programs is discussed in detail herein below.

Defendants have also failed to make appreciable progress in several other significant areas.  They are: (1) AMHD system infrastructure, (2) implementation of crisis services, (3) treatment planning, (4) medication algorithm implementation, and (5) Community Mental

7

Health Center (CMHC) functioning with regard to center leadership structure and staff supervision.

Overall, Defendants remain far from achieving substantial compliance with the Community Plan and it appears unlikely that they will meet the June 30, 2006 deadline.  Some progress has been made but much more work needs to be done.  The reports prepared by the Evaluation Team should be reviewed for additional information.

Finally, Defendants' lack of progress with the Community Plan is adversely affecting conditions at Hawaii State Hospital and threatens to reverse the progress achieved as a result of Defendants' substantial compliance with the Hawaii State Hospital Remedial Plan in 2004.

Community Based Forensic Services and Programs

Forensic services and programming is an area which has become one of critical need and importance to the mental health system in Hawaii.

November 30, 2005 was the deadline applicable to

8

the majority of tasks related to forensic services and programs required by the Community Plan and Hawaii State Hospital related court orders.  Defendants are more than sixty days past this deadline.

However, Defendants' failure with regard to implementation of forensic services and programs is egregious because the majority of forensic related requirements come from the Hawaii State Hospital Remedial Plan ("HSH Remedial Plan") filed on February 21, 2002.  Thus, Defendants, and specifically AMHD leadership, have had four years to address the issues and requirements related to forensic services and programs, and they have little to show for the past four years.

For example, after interviewing the AMHD leadership team, the AMHD Forensic Director and several community providers in December 2005, and completing a thorough document review, Ms. Hanson-Mayer found no evidence of Defendants' progress since the Evaluation Team's June 2005 visit in the following areas of forensic services

9

and programs: (1) model court orders, involuntary treatment and medication orders, (2) proposed legislation to separate fitness from responsibility, (3) evaluation of jail diversion, forensic ACT teams, community crisis teams and (4) the location, level and timeliness of forensic services.  Additionally, Ms. Hanson-Mayer found the following three forensic program areas lacking in development: (1) outpatient fitness restoration, (2) jail diversion, and (3) conditional release.  See Page 13 of Exhibit "B".

The need for the forensic services and programs set out in the HSH Remedial Plan and the Community Plan is unmistakable and has never been clearer.

Significantly, AMHD reported that, for fiscal year 2005, 507-570 or 48%-54% of the 996 persons in the target population for the Community Plan who are currently receiving AMHD services had a forensic encumbrance of some kind.  Additionally, a study conducted in October 2005 by the AMHD Forensic Director found that approximately one-third of the target

10

population for the Community Plan referred to above is on Conditional Release status.  Based on the foregoing, a high percentage of the target population for the Community Plan is susceptible to community forensic services and programs.

Establishment of adequate forensic services and programs, and specifically, successful conditional release programming is vital to Defendants achieving timely substantial compliance with the Community Plan and to patient and public safety.

In her June 2005 report, Ms. Hanson-Mayer described how the absence of conditional release programming potentially contributed to a death and a serious assault.  Pages 16-17 to Exhibit "E" of the Tenth Report.

In her current report, Ms. Hanson-Mayer noted another clinical case review of a target population member in which the lack of conditional release programming contributed to his disappearance within 90 days of discharge from Hawaii State Hospital.  Pages 9-

11

11 of Exhibit "B".

Dr. Minkoff concurs with the above, identified three specific cases in his report and stated, "Most concerning however is the total lack of progress in the development of conditional release programming ... Most important, lack of CR [conditional release] programming is a major contributor to sentinel events and to HSH [Hawaii State Hospital] readmission."  Page 29 of Exhibit "A".

Dr. Minkoff wrote the following.

The seriousness of this issue cannot be overstated. AMHD is most significantly past (or about to be past) the due dates for compliance in an area of increasing clinical relevance to the provision of successful community based care in the entire system, the lack of which is contributing to a significant percentage of early readmissions to HSH, which is dramatically over census. Further, there was no evidence at this visit that this problem is being meaningfully addressed. At this point, it is not clear whether even dramatic action can assure compliance by June 30, 2006.

Pages 29-30 of Exhibit "A".

The Special Master and the Special Monitor agree with Dr. Minkoff and Ms. Hanson-Mayer that the need for

adequate forensic services and programs is critical and immediate.  As stated by Dr. Minkoff, Defendants' non-compliance in the area of forensic services and programs has a direct effect on readmissions and the patient census at Hawaii State Hospital.

Hawaii State Hospital Census

More than seven months ago, the Special Master pointed to the increasing census at Hawaii State Hospital as proof of Defendants' lack of progress in developing the system of community-based mental health services required under the Community Plan.

The patient census at Hawaii State Hospital has risen steadily from an average daily census of 155 in 2002 to an average daily census of 172 in 2005.  This disturbing trend has continued to the present with an average daily census of 191 in December 2005, and an average daily census of 193 in January 2006.

In the Tenth Report, the Special Master wrote the following.

It should be recalled that nearly three years ago,

13

in the Second Report and Recommendation filed on August 9, 2002, the Special Master wrote the following (after the reopening of the Guensberg Building) regarding overcrowding at Hawaii State Hospital.

In the event the patient census at Hawaii State Hospital continues to hover at or beyond **168**, and patients continue to be placed at Kahi Mohala or with other providers to receive necessary hospital care, Defendants should promptly develop and evaluate alternatives which will assure that there are an adequate number of hospital and community-based residential beds to serve the population of mentally ill persons in need of hospitalization or residential care.

[cite omitted]

It is reasonable to conclude that the increasing census at Hawaii State Hospital is due, in part, to "back door" and "front door" issues related to Defendants' slow implementation of the Community Plan.

Simply put, Hawaii State Hospital is unable to efficiently transfer patients from the hospital setting into the community because the system of community-based mental health services is not adequate or fully prepared to receive, treat and follow the patients.  This is the "back door" issue at Hawaii State Hospital, that is, because patients are not leaving the hospital, the census at Hawaii State Hospital is increasing and remains high. Because patients who have completed their hospital treatment are not being efficiently transferred from Hawaii State Hospital into the community, persons in the community with serious mental illness who are in need of hospital services cannot

14

be admitted to Hawaii State Hospital due to the unavailability of bed space.  Further, patients discharged from Hawaii State Hospital with less than adequate community placement and programming promptly decompensate and require re-admission to the hospital.

The "front door" issue which exists at Hawaii State Hospital is that persons with serious mental illness in need of hospital based services are unable to receive them in a timely manner and are stacked up waiting to be admitted.  This circumstance contributes to an increasing and elevated census.

Pages 36-38 of the Tenth Report (emphasis added).

Little has changed since July 2005 when the census began routinely topping 180.  The "back door" and "front door" issues described seven months ago in the Tenth Report continue to exist today and are persistent reminders of Defendants' lack of progress with regard to the Community Plan and the failure of AMHD leadership to achieve substantial compliance.

In the Tenth Report, the Special Master wrote the following regarding AMHD contracting with Kahi Mohala.

Beginning in or about September 2001, Defendants contracted with Kahi Mohala for additional bed space to address the overcrowded situation at Hawaii State Hospital.  As of July 1, 2005, AMHD

15

has contracted with Kahi Mohala for 8 acute beds and 32 intermediate stay beds for a total of 40 contracted beds.  <u>The contracted rates for each of the acute and intermediate stay beds are $730 and $680 per day, respectively.  Thus, the approximate total cost per day for the 40 beds is $27,600, the approximate total cost per month for the 40 beds is $828,000, and the approximate total annual cost for the 40 beds is $10,074,000.</u>

Significantly, the average daily census at Kahi Mohala for the AMHD contracted beds in the last three months was as follows: April 2005 - 39 beds; May 2005 - 42 beds; and June 2005 - 45 beds.  Kahi Mohala charges AMHD the lower rate of $680 per day for the over-flow number in excess of 40 beds. <u>Thus, for the past three months alone, AMHD has incurred more than $2.5 million for the contracted beds at Kahi Mohala.</u>  The total amount paid to Kahi Mohala for contracted beds to address overcrowding at Hawaii State Hospital since September 2001 is not known.

Pages 38-39 of the Tenth Report (emphasis added).

This item has worsened.  Defendants continue to contract with Kahi Mohala for additional bed space.  The average daily census at Kahi Mohala for AMHD contracted beds in the last 3 months was at the contract maximum of 42.  Thus, the extraordinary cost of having to pay for Kahi Mohala beds continues unabated and has increased since the Tenth Report.

16

Finally, in the Tenth Report, the Special Master wrote the following regarding the negative effects of overcrowding.

Further, the budgeted capacity of Hawaii State Hospital is 168 patients, which means that staff, services and supplies are budgeted for a population of 168 patients.  When the hospital census exceeds 168, Hawaii State Hospital incurs additional costs and expenses such as staff overtime, supplies, services and operational expenses for the number of patients above 168.

Based on historical events, we know that overcrowding has a negative effect on the quality of treatment provided to patients at Hawaii State Hospital.  Hospital clinical staff is strained and overburdened.  Hospital facilities and resources are stretched beyond their limits.  Overcrowding represents a step backwards in the progress made at Hawaii State Hospital.  This very serious issue was discussed with defense counsel months ago as the census at Hawaii State Hospital began to rise.

Pages 39-40 of the Tenth Report (emphasis added).

There is no dispute that overcrowding has adversely affected the quantity and quality of treatment provided to patients at Hawaii State Hospital.

Several times in the last quarter of 2005, classes and services provided to patients at the HSH rehabilitation treatment mall were curtailed or

17

cancelled because the mall could not accommodate the increased number of patients at Hawaii State Hospital. Very simply, there was not enough staff to safely and effectively teach classes and supervise patients.

The treatment mall was then closed in January 2006 due to an outbreak of chicken pox. The plan was to reopen February 6, 2006, but this was postponed due to a lack of space and staff. HSH staff has reportedly resisted pressure from AMHD leadership to re-open the treatment mall on an "as is" basis citing safety, hygiene, and clinical reasons. As of February 8, 2006, the treatment mall at Hawaii State Hospital remained closed to patients.

In December 2005, some patients had to sleep on mattresses placed on floors in conference or activity rooms because there were no available patient rooms and some patients did not have access to proper bathroom and shower facilities due to the increased number of patients at Hawaii State Hospital. These patients now have beds but must continue to walk through communal

areas in order to get to the bathroom or shower.  On one HSH unit, patients shower in staff areas.

It was reported to the Special Monitor that Hawaii State Hospital was seeking licensing waivers because existing conditions may place the hospital in violation of applicable state licensing rules and requirements. Waivers or relief from licensing requirements alone will not improve the existing health and safety conditions at Hawaii State Hospital.  For example, on one HSH unit, twenty or more male patients have only 2 showers and 3 toilets available for their use.

It has also been reported by HSH staff that the number of patient to patient assaults increased in December 2005, and that staff are reluctant to accept overtime shifts.  As a result, the frequency of daily staff-patient ratio shortages is increasing.

Some of the above issues and concerns were presented to the Director of the Department of Health and defense counsel by the Special Master and the Special Monitor at a meeting on January 6, 2006.

The Director of the Department of Health responded to the Special Master in a letter dated February 3, 2006, which is attached as Exhibit "D" to this Report.

The Special Master appreciates the commitment and extraordinary efforts being made by HSH staff to sustain the progress made at Hawaii State Hospital in 2004.

The Special Master also recognizes the recently commenced and ongoing work by Defendants to address census related issues at Hawaii State Hospital.

The personal commitment of the Director of the Department of Health and her direct involvement with the problems and very troubling facts and circumstances at Hawaii State Hospital is appreciated because there is a concern that the situation at Hawaii State Hospital may get worse before it gets better.  Hopefully, this will not be the case but after receiving the Director's correspondence, the Special Master learned that Connie Mitchell, the highly regarded Director of Nursing at Hawaii State Hospital, had submitted her resignation. Ms. Mitchell, along with former HSH administrator Paul

Guggenheim, HSH medical director, Rupert Goetz, M.D., Kris McLoughlin, the court appointed Special Monitor and the dedicated HSH staff were instrumental in helping Hawaii State Hospital to achieve substantial compliance with the HSH Remedial Plan in 2004.

Conclusion

The Joint Stipulation presents Defendants, and specifically, the Adult Mental Health Division, Department of Health ("AMHD") with an extraordinary opportunity to complete the work that needs to be done to establish the framework for a sustainable system of community mental health services.

The Joint Stipulation came about, in large measure, because there was recognition of the remarkable change and progress made at Hawaii State Hospital in 2004 and a concomitant willingness to provide AMHD with the best chance possible to achieve timely substantial compliance with the Community Plan under the circumstances. Simply put, it was understood by all involved that if AMHD and Defendants achieved substantial compliance with the

Community Plan, the immediate and long term benefits to Hawaii State Hospital, mental health consumers and the public would be great, and the integrated hospital-based and community-based mental health system contemplated by the "omnibus plan" would be a step closer to reality. This "big picture" goal was shared by the parties, counsel, the Special Monitor and the Special Master. The foregoing, and not the fact that this lawsuit would end in November 2006, was the primary driver to the Joint Stipulation.

The Joint Stipulation requires Defendants to continue their efforts to implement the Community Plan under supervision of the Court, even after June 30, 2006, and until November 30, 2006.

Therefore, based on the plain language and the spirit underlying the Joint Stipulation, it would be wrong for AMHD leadership to not urge or put forth their reasonable best efforts to achieve timely substantial compliance with the Community Plan.

AMHD leadership should seize the opportunity,

follow the "road map" previously provided by the Evaluation Team and utilize the technical assistance offered by the Evaluation Team and the Special Monitor to achieve a positive outcome in this case.  While the June 30, 2006 deadline for Defendants' substantial compliance with the Community Plan is only five months away, there is still an additional five months to the November 30, 2006 dismissal date of this lawsuit.  Thus, AMHD and Defendants have ample opportunity, a total of ten months, in which they can fully and forcefully demonstrate their stated commitment to persons in the community with serious mental illness and the public at large.

Anything less than a full and complete effort by AMHD and Defendants to achieve substantial compliance over the next ten months depreciates the extraordinary efforts being put forth on a daily basis by the individuals working at Hawaii State Hospital, the Community Mental Health Centers and other service providers, the Service Area Administrators, the Service

Directors and other key individuals at AMHD and elsewhere who are working hard to respond to earlier recommendations, to provide quality service to consumers, to develop the system of care and to implement the Community Plan.

Finally, there is an immediate need for Defendants to achieve substantial compliance with Community Plan items, such as community based forensic services and programs, which directly affect the patient census at Hawaii State Hospital.  AMHD's past inability to make substantial progress with regard to the Community Plan and failure to take prompt action at Hawaii State Hospital in 2005 to address overcrowding issues may have the catastrophic effect of undoing all that was achieved at Hawaii State Hospital in 2004.

Frankly, AMHD's time for discussion and planning for the overcrowding at Hawaii State Hospital occurred in the past seven months - what is required now is focused action by AMHD.  Considering AMHD's apparent confusion and lack of direction in the past, the Special

24

Master appreciates the Director of Health's assistance and involvement in this regard.  The Director's February 3, 2006 letter response was timely, on point and conveyed an understanding of the urgency, analysis and action needed at this time.

The Evaluation Team's final community site visit is scheduled for June 26-30, 2006.  The Special Master recognizes and thanks the members of the Evaluation Team for their continued assistance and service to the Court. These three individuals have at all times acted in accordance with the highest professional standards and in the best interests of mental health consumers, the public and the parties.

The same is true with regard to Kris McLoughlin, the court appointed Special Monitor.  Pursuant to the terms of the Joint Stipulation, Ms. McLoughlin will continue to assist the Court until the termination of the case on or before November 30, 2006.

After their final site visit, the members of the Evaluation Team will submit written reports which will

25

present their respective findings and conclusions with regard to whether Defendants have achieved substantial compliance with the Community Plan by June 30, 2006, and other matters which they deem appropriate to the case.

The Special Master will continue to monitor conditions and developments at Hawaii State Hospital, confer with Kris McLoughlin, the court appointed Special Monitor, communicate with counsel and prepare a closing report for this fifteen year old CRIPA lawsuit upon receipt of the Evaluation Team's final reports.

In closing, the Special Master requests that District Judge Ezra schedule a hearing on this Eleventh Report and Recommendation and allow the parties a reasonable opportunity to file comments and objections, if any, to this Eleventh Report and Recommendation.  If there are no objections or opposition filed by the parties to the Eleventh Report and Recommendation and its proposed approval, the Court may deem the matter appropriate for disposition without a hearing and issue an appropriate Order.

IT IS SO FOUND AND RECOMMENDED.

DATED: Honolulu, Hawaii, February 10, 2006.



_____
Kevin S.C. Chang
United States Magistrate Judge

CIVIL NO. 91-00137 DAE-KSC; UNITED STATES OF AMERICA vs. STATE OF HAWAI'I, et. al.;
ELEVENTH REPORT AND RECOMMENDATION