# EXHIBIT

# A

CIVIL NO. 91-00147 DAE-KSC
USA vs. STATE OF HAWAI'I, et. al.
ELEVENTH REPORT AND RECOMMENDATION

**Kenneth Minkoff, MD**
**100 Powdermill Road, #319**
**Acton, MA 01720**
**617-435-5919**
**Kminkov@aol.com**

January 15, 2006

Magistrate Judge Kevin SC Chang
PJKK Federal Building
300 Ala Moana Boulevard C-209
Honolulu, HI 96850

Dear Judge Chang,

At your request, on December 5-9, 2005, a sixth team evaluation was conducted of the Hawaii Adult Mental Health Division (AMHD) to determine progress in compliance with the Community Plan related to the Department of Justice civil rights action that was issued under your authority in January 2003. Findings and recommendations contained in this report are based on discussions with AMHD leadership, a review of documents provided by AMHD and its vendors, patient record reviews, interviews held with various AMHD and vendor staff, and a tour of various elements of the service system for individuals with mental illness, including AMHD operated services, AMHD contracted services, and other services that operate with independent funding sources. Because this survey was conducted as a team, the following expert psychiatric report must be reviewed in conjunction with the report from the expert nurse (Gail Hanson-Mayer, RNCS) and expert administrator (Paul Gorman, EdD). Because all the team members reviewed different components of the service system at times, this report covers all aspects of care, not just issues specifically related to psychiatry. In addition, Dr. Gorman, Ms. Hanson-Mayer and I have constructed a grid of the Community Plan implementation tasks, as a method for clearly demarcating the progress of AMHD in meeting Plan requirements. This grid will be included in Ms. Hanson-Mayer's report (as it was in the last report), but will incorporate all of our findings.

## DATA BASE

## DOCUMENTS

## AMHD DOCUMENTS

AMHD provided an Implementation Timeline Report that incorporate a comprehensive list of "deliverables" and associated documents reflective of progress in meeting the timelines of the AMHD Strategic Action Plan.

In addition, the following documents were reviewed: (Where timelines are not specified, the documents refer to the time period between June and December, 2005).

1. All minutes of the Executive Team, Action Plan Team, and Daily Report for the period from October 1 to the December visit.
2. All minutes of meetings involving the Service Directors as a group, and SAAs as a group.
3. Organization Chart for AMHD
4. Dr. Hester's memo describing the organization chart and how it functions
5. Documents describing the functions and responsibilities of each member of the Executive team and Organization Chart, including descriptions of the relationships of SDs and SAAs.
6. Job Descriptions of all new positions at the Senior Management Level
7. CVs of new hires at the Senior Management level (Medical Director, Clinical Operations Director, Provider Relations Director)
8. Documentation of ads and hiring processes for unfilled positions in implementation plan
9. All documentation related to activities in the development of AMHD HR processes: memo describing process, PAS training and forms, documentation of supervisory activities in this framework, new employee orientation, HR database, and development of core competencies
10. Documentation of description and training on AMHD Committee structure, and documentation of all committee meeting minutes, as well as documentation of the reporting structure.
11. Documentation of descriptions of service array for each island with new crisis vendor, and all data regarding performance improvement and monitoring related to those services.
12. Documentation of all the action plan areas concerning shifting functions from Access to UM, and new policies and procedures for Access staff regarding management of crises, and collection of population information.
13. Documentation of all new LCRS implementation, and data on utilization
14. Documentation of content of access staff crisis training.
15. Data tracking of call monitoring, CMO tracking, and evidence of improvement activities.
16. Documentation of changes in UM activities: new procedures, forms, functions, including data streamlining the UM process, and any memos to providers about UM activities.
17. Reports on UM denials or on site reviews, and any appeals in the last three months.
18. UM Consultation Report
19. UM analysis report by Helene Jo that is due Nov 30, including recommendations to ET. (not available)
20. Update on MRO implementation – current data
21. All minutes of QIC, and all related QI activities, including work teams
22. Minutes of Quality Council

23. All minutes of meetings with AMHD leadership and POS providers. ACT improvement activities: documentation of recruitment of TA, TA and training activities, discussions with providers to assist them to develop their own improvement plans, outcome tool and process for using outcome tool.

24. Current improvement activities regarding engagement , retention, and crisis response for ACT clients. (requested, not provided)

25. Description of development of CM core competencies

26. Documentation of changes in ICM, and performance improvement data to track impact on coordination and continuity. ((requested, not provided)

27. Revised scope of service for CM, and resource manual for CM

28. Documentation of continuity and coordination of care model recommendations

29. Documentation of change in billing regarding recovery planning

30. Documentation of all meetings held by Medical Director, including Med Exec, CMHC Medical Directors meetings, from October to December.

31. Documentation of recovery planning implementation team, planning for prioritization of ownership of recovery planning when multiple agencies involved, and copy of the recovery planning resource kit

32. Evidence of performance improvement activity related to recovery planning at the provider level. (requested, not provided)

33. Provider bulletins since August, survey results, report based on survey, and evidence of responses to provider concerns in this process. (Survey results were requested, but not yet available)

34. Documentation of content of orientation briefings on action plan and court evaluation process going forward.

35. Revised QM plan.

36. Proposed new indicators from QIC.

37. Evidence of involvement of QIC in reviewing clinical events that create systemic performance improvement opportunities, and documentation of improvement activities that emerge. (requested, not provided)

38. Documentation of all medication algorithm pilot activities and data, and MEC oversight.

39. All sentinel events and consumer complaints from June-December, tracking, follow up of individual events, analysis for improvement opportunities, and evidence of QI activities that result. Example of the Sentinel Event Data Base.

40. Description of planning for Exceptional Case Review, and information about case.

41. Documentation of provider monitoring activities June-December, improvement efforts, and investigations, including new critieria and procedures, as well as the core data.

42. All policies and procedures completed or in draft, in the past six months, not otherwise provided...

43. Documentation of employee review processes in AMHD senior management, and at CMHCs. Indication of disciplinary processes for AMHD employees currently "detailed" from their positions due to performance issues. (requested, not provided)

44. Copy of most recent consumer handbook.

45. Evidence of root cause analyses or similar process related to any recent deaths, and documentation of how this analysis has resulted in recommendations for systemic Quality Improvement activities. (The only such analysis provided was a case review written by the Special Monitor and Dr. Koyanagi)

46. Complete roster of all provider complaints, including documentation of reviews and follow up improvement activities.

47. All target population and at risk data reports developed in the last quarter, inlcuding preliminary reports for the annual Target Population Report.

48. Data reports used by SAAs and SDs to review and revise planning documents.

49. All SAA reports regarding county specific activities in the last quarter

50. Any additions or amendments to the State Service Plans, and any documentation of data or reports collected by the Service Directors regarding any monitoring the outcome of their plans or assessing the needs in their areas (requested, not provided)

51. Charts from ACCESS of five cases which illustrate improvement of access and continuity of crisis response, due to efforts in the past three months.

52. Evidence of meetings between AMHD and representatives of ERs on Oahu regarding coordination of crisis response.

53. Documentation of all activities related to Dropped Case improvement work team, including evidence of progress in reduction or tracking of dropped cases. (requested, not provided)

54. All minutes, information, etc on any state level meetings regarding forensic mental health issues in which AMHD staff or attorneys have participated

55. All Forensic SWIT or Forensic team activities not already mentioned: specifically (but not limited to), documentation of protocol for conditional release monitoring and intervention to prevent clinical regression prior to revocation; evidence of dissemination of a protocol for facilitation of civil commitment initiation by clinicians, rather than requiring a judge (requested, not provided)

56. Forensic Manual. Point in Time CR study

57. Ann Andreas report on six forensic issues that AMHD has addressed.

58. All information and minutes on the state COSIG project

59. All information, including data collection, related to the MISA Screening Initiative.

60. Evidence of progress in Dual Diagnosis Capability in CMHCs and POS providers, starting with MISA pilot project activity..

61. Any additions or amendments since June to the Statewide Comprehensive Integrated Service Plan and each county's Service Area plan. (requested, not provided)

62. Meeting minutes for the last 3 months of the CMHC Management Team CMHC Leadership Teams, CMHC Directors, the CMHC Medical Directors, the Medical Executive Committee, the MI/SA SWIT and the Forensic SWIT.

63. Documentation of the PAS trainings for CMHC mgrs and medical directors

64. All meetings involving Case management supervisors, MISA coordinators and forensic coordinators in the CMHCs, including descriptions of their jobs and activities, including clinical case loads. List of positions and names of person in the positions for each clinic.

65. Any new CMHC policy development, eg regarding case loads, quality management, medical practice and case load, productivity.
66. All data in the last six months addressing case load requirements for POS and CMHC case managers, including actual case load data and plans to address shortfalls regarding Community Plan requirements. Documentation of revised integrated case load model
67. Dccumentation of the new UM processes regarding LOC assignment, and matching that to case management service intensity need.
68. Minutes of all key provider or stakeholder meetings in the last 6 months overseen by each SAA.
69. Evidence of provider meetings being used to organize care coordination within a particular geography for shared clients across providers. (requested, not provided, other than from Maui)
70. Minutes of all provider meetings attended by the Provider Relations Director, and documentation of any feedback collected by the Provider Relations Director from these meetings..
71. Minutes of staff meetings in the last 3 months from each CMHC ..
72. Forensic Data tracking reports
73. MISA Data tracking reports
74. Data monitoring timely access to initial assessment. Documentation of elimination of two step assessment process in all CMHCs.
75. Target population list by current location in Discharged, Diverted, and Transferred categories, including list of service authorizations and Locus scores for each client.
76. Same as above including documentation of services actually received for five HSH discharges in three consecutive months.
77. Description of some activities in the past six months undertaken by Quality Management regarding developing and implementing collaborative monitoring of POS and AMHD providers.
78. Report of all HSH and Kahi oversight activities: meetings, reports, data gathering about staffing, programming, restraints, sentinel events, abuse/neglct.
79. Similar report about activities regarding HSH and Kahi community linkage: case manager assignment, case manager participation in treatment planning, discharge follow up
80. Latest copy of the AMHD Provider manual, including provider feedback and resulting changes. .
81. Minutes of activities related to crisis service development in Oahu and Maui, including meetings involving police, homeless providers, hospitals, etc.
82. Meetings with homeless providers to discuss facilitation of access of homeless mentally ill to crisis intervention and continuing case management, and outcome of that process improvement.
83. Documentation of meetings with consumer and familiy advocates during the last three months..
84. Documentation of use of LCRS or CMO services to provide 24/7 outreach to consumers in Queens or Castle ER. Data on how many consumers received this service.

85. Documentation of meetings with AMHD leadership and hospitals on Oahu or the neighbor islands to develop agreements, standards, monitoring, etc.
86. Documentation of implementation of the MI/SA Comprehensive Programming Contract RFP
87. Documentation of all efforts to establish consistent treatment planning and treatment management teams for consumers that cross boundaries between CMHC and POS providers (requested, not provided)
88. AMHD Policy on Developing Policies (dated 2003), and more recent policies and procedures regarding the issue of developing systemic procedures..
89. AMHD Compliance Report on Policy Development.
90. Minutes of three months of meetings of service area planning boards, state mental health planning council...
91. Updated MOU with DD services (requested, not provided)
92. All minutes of meetings held by Office of Consumer Affairs in past three months.
93. Documentation of clubhouse development and monitoring
94. Evidence of development of wet, damp, dry housing, and intensive case management supported housing models, including specific follow up to the initiative planned by Bernie Miranda regarding a damp housing model.. Provision of data regarding housing units, type of housing provided, and how the housing is developed in relationship to assessment of need.
95. Follow up data on the initiative that was set up to intervene to prevent consuemrs from losing their housing by providing intensive early intervention when at risk.

## MEDICAL RECORDS

Sentinel Event Records, as follows:



a. ▮▮▮▮ – Not DTD
b. ▮▮▮▮ – Not DTD
c. ▮▮▮▮ – Not DTD
d. ▮▮▮▮ - DTD
e. ▮▮▮▮ - DTD
f. ▮▮▮▮ – Not DTD
g. ▮▮▮▮ - DTD
h. ▮▮▮▮ - at risk
i. ▮▮▮▮ - DTD
j. ▮▮▮▮ - DTD
k. ▮▮▮▮ - DTD

.Treatment Plan Reviews:
    2 DTD cases at Maui CMHC (numbers not recorded)
    1 DTD ICM case from Care Hawaii (number not recorded).

ACT Reviews:
    Case ▮▮▮ – Care Hawaii ACT, DTD
    Case ▮▮▮ - Care Hawaii ACT, DTD

### STAFF INTERVIEWS AND MEETINGS

1. Meeting with AMHD Chief, Dr. Hester
2. Meetings with Dr. Fukino and Michelle Hill
3. Meeting with AMHD Medical Director
4. Meeting with QI Administrator
5. Meeting with Provider Relations Director
6. Meeting with Clinical Operations Chief
7. Meeting with Executive Team
8. Meeting with SAAs, individually with Oahu and Maui
9. Meeting with SDs: individually with housing, MISA, treatment, crisis
10. Meeting with QIC
11. Meeting with COSIG team and MISA Coordinators
12. Meeting with Forensic Coordinators
13. Meeting with MIS and SERS staff (John Jensen, Mike Wylie)
14. Meeting with Quality Council
15. Meeting with Kahi and HSH to discuss community oversight and linkage.
16. Meeting with Queens leadership, Oahu SAA, Crisis Services Director, Medical Director
17. Meeting by phone with statewide Crisis provider leadership
18. Meeting with homeless reps to discuss crisis services on Oahu.
19. Meeting with Chad Koyanagi, MD
20. Meeting with Wayne Law and Troy Freitas
21. Meeting with CMHC Medical Directors
22. Meeting with Medical Executive Committee..
23. Meeting with Keith Claypoole, previous Acting KCMHC Director, and newly hired KCMHC Director.
24. Meeting with Care Hawaii ACT Team.
25. Meeting with Medical Staff and Clinic staff (including clinic administrator, Kathleen Tom) at Maui CMHC
26. Meeting with Maui providers regarding coordination of treatment planning and other activities between providers.
27. Meeting with representatives of major POS Providers, including consumer providers
28. Meetings with AMHD teams for provision of Technical Assistance per AMHD request: Recovery Planning, Quality of Care, Continuity of Care, and Crisis Services

### FINDINGS

### General Findings

AMHD has undergone considerable change since the time of our last visit in June 2005. There is a new organizational structure, new hires in critical leadership positions, a

new court ordered Community Plan implementation timeline filed on November 30, 2005, and a new internal (not court-ordered) "AMHD Action Plan" to structure the attainment of objectives in relation to the implementation timeline. In addition, some of the important deficiency areas identified in the previous report are now being addressed with significantly increased focus and intensity. All of these features create a sense of "possibility" that AMHD could conceivably achieve substantial compliance with the Community Plan by the deadline of June 2006. Nonetheless, some critical deficiencies remain, and there are some areas which have actually gone backwards. In addition, the "promise" of the new organizational structure, and the new hires, is, as yet, just that: a "promise" that has yet to be fulfilled. The coming months will determine whether the areas of critical deficiency will be addressed with sufficient intensity and whether adequate progress will be made in those areas that are significantly behind the expected timelines. The coming months will also determine whether the potential inherent in a hnew leadership team will actually be able to demonstrate both consistent direction and measurable progress, or whether continuation of problems identified in previous reports will undermine the ability of the new leadership team to be successful.

In this report, I will roughly follow the outline of the most recent court ordered Community Plan Implementation Timeline agreed upon by AMHD and The U.S. Department of Justice (DOJ) and to specify achievement of objectives in relation to the Community Plan. I have moved some items (e.g., Quality Improvement and Information Systems) earlier in the sequence, because of their overarching importance, and added other areas (e.g., MISA) that are included in the Community Plan but which are still not included in the Implementation Timeline or in the AMHD Action Plan.

**Administrative Structure:** At present, AMHD's new organizational structure is out of compliance with the Community Plan. The areas out of compliance relate to the reporting relationships of the SAAs, the Planning and Compliance Director, and the Forensic Services Director, as well as the relative positioning of the CMHC System Administrator. Efforts to seek modification of the Community Plan to support this new organizational structure were not in evidence at the time of my visit. The new AMHD organizational administrative structure has some considerable strength. However, the critical problem areas listed below must be addressed quickly.

First, the strengths: AMHD has identified a **Chief of Clinical Operations** to function essentially as a Chief Operating Officer for all clinical services and system development. The individual selected, Karen Krahn, appears to have considerable ability to organize detailed data driven problem solving for important clinical process issues that cross multiple boundaries between Service Directors and Service Area Administrators, and has begun the effort to create a functional supervisory structure that links the activities of these individuals into a coherent whole. This is one area that holds promise for the development of the functional "team decision making" that was discussed in my previous report. Second, AMHD has hired a new **Medical Director**, William Sheehan, MD, who is highly regarded in both the public and private sector community, and has practical experience as a quality oriented system Medical Director with Kaiser. Both Dr. Sheehan and Ms. Krahn have been on board for a few months "learning the system", and at the time of our visit were beginning to take steps to organize the implementation activities of some of the most important clinical processes required in the Community

Plan (see below) into a coherent, quality improvement oriented framework. In addition to these two individuals, Helene Jo has been promoted to **Quality Management Director**, a position which oversees all aspects of Performance Management (including both Quality Improvement and Contract Monitoring) and Utilization Management. Dr. Sheehan, Ms. Krahn, and Ms. Jo are a "triumvirate" that collectively oversee (or have the potential to oversee) almost all aspects of clinical operations. ***If they develop the capacity to work as a fully collaborative team, with Dr. Sheehan as the "lead" to ensure that both operational and performance management/utilization management decisions are positioned within the value-driven clinical framework expected by the Community Plan, AMHD could make considerable progress over the next six months.*** However, there are very significant problems that must be addressed for this success to be achieved:

1. **Role of the Service Area Administrators**
2. **Organizational positioning of State Operated Services**
3. **Organizational positioning of Forensic Services**
4. **Management and accountability of Fiscal Services**
5. **Empowerment of Provider Relations and Consumer Affairs**
6. **Supervisory Structure and Function**
7. **Ensuring priority of clinical values in organizational decision making.**

- **Role of the Service Area Administrators:** The Community Plan envisions the SAAs to directly report to the AMHD Chief and to be the locus of oversight, planning, and coordination of the "system of care" in each county, from the perspective not of individual service types but from the needs of the population as a whole, based on input from consumers, families, advisory boards, and other stakeholders, as well as from providers and other members of the AMHD management team. In my previous visits, I noted that the SAAs had begun to develop the authority and access (through participation in Daily Report and on the Executive Team) to become more effective in carrying out this role, but that further development of their capacity to organize local systems of care still needed to occur. On this visit, however, I found that the role of the SAAs had become uncertain, and somewhat de-positioned. This is partly due to the fact that the SAAs no longer directly report to the Chief, although the potential ability of the Chief of Clinical Operations to effectively align the functions of Service Directors and SAAs within the new reporting structure may enhance operational functioning and thereby reinforce the ability of the SAAs to function in their roles. More concerning, however, was the apparent removal of the SAAs from the Executive Team (as indicated by Dr. Hester's memo outlining the roles and functions of various members of the Executive Team). This is of particular significance because the SAAs need to have oversight over direct operated services in their counties, as well as the capacity to integrate administrative requirements, quality concerns, and input from consumers and providers. If it is not clear that they are at least at the same level of participation as other members of the Executive Team (particularly the AMHD CMHC System Administrator), even if they are not directly reporting to the Chief, then their authority is clearly undermined. Dr. Hester assured the Evaluation Team that the SAAs would be remaining on the Executive Team, but at the time of our visit there was no

documentation to that effect, and none of the SAAs had been told that would be the case.

- **Role of the CMHC System Administrator:** In the Community Plan, AMHD is committed to maintaining a clear boundary between its oversight functions and its direct operations at the state hospital and at the mental health clinics. Over the past two years, AMHD has attempted a variety of methods of achieving this boundary, while retaining the ability to coordinate services effectively across multiple providers, both direct operated and POS. In the most recent organizational chart, the balance appears to have been lost, and those responsible for state operated services are on now on the Executive Team with direct access to the Chief, and those responsible for oversight of those services (Service Directors and SAAs) have been positioned at a lower level. This has not escaped notice, and one provider commented on this arrangement to us as reflecting a conflict of interest in violation of the Community Plan. <u>It is critical that this issue be addressed by re-alignment of the organizational structure to reinforce the capacity of AMHD to have oversight of its direct providers and the services they provide on par with POS providers.</u> I am not making a specific recommendation for an alternative structure. Other systems have attempted to solve this in a variety of ways; it is critical however that AMHD avoid both the fact and the appearance of conflict of interest in the organizational chart, while maintaining the ability of the organization to function across all types of services effectively and efficiently.

- **Organizational Positioning of Forensic Services:** In the Community Plan, and in previous iterations of the organizational chart, Forensic Services Director was positioned as one of the Service Directors. This positioning appeared to have merit, because it allowed coordination between Service Directors in areas of overlap in relation to providers, which, as specifically noted in the Community Plan, is particularly relevant to areas like Forensic Services and MISA Services which overlap activities in every domain. At the time of this visit, however, the position of Forensic Services Director appeared to have changed. Forensic Services does not now report to either the Medical Director, as in the past, or to the Chief of Clinical Operations, along with the other Service Directors, but rather directly to Dr. Hester. I was told this was because neither Karen Krahn nor Dr. Sheehan were familiar with "Forensics", but my assessment is that the real reason may be because Dr. Kennedy would only agree to report to Dr. Hester. As a direct report to Dr. Hester, the Forensic Services Director has been sitting on the Executive Team, even though other Service Directors do not attend, and has not been attending the Service Director meetings held by Karen Krahn. Again, Dr. Hester informed us that Dr. Kennedy was no longer on the Executive Team, but there was no documentation of this, and Dr. Kennedy did not appear to be aware of this. Further, the ability of the organizational structure to assure the appropriate coordination of Forensic service activities with other services, as well as with the SAAs, appears to have been compromised. Given that Forensic Services is one of the major areas that has fallen behind, as shall be described later in this report, it would seem imperative that Forensics be appropriately positioned in the organization. Even if there are particular reasons for

maintaining a direct report to Dr. Hester, it is critical that Forensics maintain a position of parity and coordination with the other Service Directors.

- **Planning and Compliance:** In the Community Plan, these positions report directly to the Chief. In the current organizational structure, they report to the QI Administrator. The Compliance Director position is unfilled.

- **Management and Accountability of Fiscal Services:** At present, there is a plan to recruit a Chief Fiscal Officer, but this process has not really unfolded. Currently, reports of difficulty with responsiveness from Fiscal continue, both from POS providers, and from within AMHD. As a provider relations issue, it is a concern when providers perceive themselves to be held to a higher standard of accountability around timelines than AMHD holds internally, particularly around issues related to prompt payment.

- **Empowerment of Provider Relations and Consumer Affairs:** In the Community Plan, the Consumer Affairs Director is a direct report to the AMHD Chief while the reporting relationship of the Provider Relations Director is not specified, but both are expected to be empowered to represent the voices of consumers and providers respectively at the highest levels of AMHD decision making. Currently, both positions do report directly to Dr. Hester, and do sit on the Executive Team, but it is not clear that appropriate infrastructure has been created to ensure that their voices are truly empowered on an equal footing with other senior staff. John Carollo was an excellent choice as Provider Relations Director, as he is very familiar with the system, and has been highly energized in soliciting input from providers. John has reported, however, that he is not clear how his input will be heard at the Executive Team level when there is a dispute between providers and other members of the Executive Team (e.g., Quality Management or Clinical Operations). He told me that he had not had an individual supervision meeting with Dr. Hester in the five months since he came on board, and there was no procedure by which he had been delegated authority to call together other members of ET to resolve disputes or concerns raised by providers. I have similar concerns about the degree to which the Director of the Office of Consumer Affairs has been encouraged or empowered to represent consumer concerns and values at the leadership level as well.

- **Supervision:** This was a major area of concern in my last report, and remains a concern. AMHD has begun to require the use of formal PAS supervision structures consistent with the rest of the Department of Health, and has required all managers to receive training in using this framework. However, my observation is that these tools are actually not yet being used consistently. Even more worrisome, I did not observe any instance in which formal supervision was being utilized as a way of promoting organized staff development, monitoring performance, and ensuring oversight and coordination between senior staff who may have competing perspectives. One example of this relates to Provider Relations, but an even more concerning example relates to apparent disagreements (noted in successive iterations of the AMHD Action Plan) between Wayne Law and Reneau Kennedy about responsibility for certain aspects of Forensic Services implementation that have not been resolved by effective supervision by Dr. Hester. Appropriate supervision and direction is essential for

staff in any complex organization, let alone an organization faced with the time pressure to meet the full requirements of the Community Plan in only six months.

- **Value Driven Team Decision Making:** I raise this here because this was a critical issue raised in my previous report. Essential to the Community Plan is that the AMHD system operationalizes a set of "guiding principles" that reflect recovery orientation and consumer empowerment. It is not sufficient merely to write these values down or talk about their importance. Value-driven decision making at each level of the organizational structure must be incorporated into the infrastructure of the decision making processes themselves, so that all decisions are reviewed through the filter of the values that are the major goals of system design. Compared to the previous visit, I observed some progress in this area, but much more work needs to be done. In this visit, the Executive Team was able to engage in a more organized and extensive discussion about the implementation of welcoming, recovery-oriented values, based on a set of recommendations coming from the SAAs. It was clear that some progress had been made in the ability of the group to engage in a team decision making process. However, it was also clear that this team decision making process was still awkward, and that the use of principles or values related to the Community Plan to inform routine decision-making had not yet been contemplated. Later in the visit, further work on this issue took place in the Quality Management Committee (see below.) This latter activity represented important progress in this area, which will need to be sustained, strengthened, and anchored in place in order to achieve compliance.

I want to now review individual areas of focus in relation to the community plan, and describe the status of these areas at the time of this visit.

## PART I: SYSTEM INFRASTRUCTURE ACTIVITIES;

### Quality Management and Performance Management:
I continue to emphasize the importance of a Quality Culture operationalized through the use of organized Quality Management structures and activities in creating the framework for implementation of the values in the Community Plan. As I noted in my previous report, *it is critical at this juncture in the implementation of the Community Plan that AMHD leadership can recognize the connection between poor clinical outcomes and system development priorities. Achieving compliance with the Community Plan would not require that every problem be solved, so much as that the system has the internalized capacity to use its own data to recognize problems and self correct over time*. Note that Quality Management at this level cannot be accomplished merely by monitoring individual provider performance, though this activity is needed as well. More critical is the capacity of AMHD to analyze clinical outcome data from multiple sources (UM, MIS, Sentinel events, complaints, Performance Management) to identify larger systems issues that require improvement in order to achieve desired results for the target population. There is evidence of some significant progress in this area, though much more work needs to be done.
I will begin with the bright spots. First, Dr. Sheehan, as the Medical Director, clearly has had direct experience with clinically driven quality management at Kaiser.

Even more important, he demonstrates the capacity to recognize "in his gut" the significant quality issues that the system has to address, and realizes his responsibility to raise those issues to the level of importance in the AMHD system that will allow them to drive the needed change processes to achieve success. In talking with Dr. Sheehan, I found that he had already reviewed significant critical incidents from before he was hired, and was able to identify how each incident raised a large number of serious quality concerns that the system has to address. In my view, the first step toward being able to make significant process is at least to understand the problem. It is very good news that the Medical Director appears to be able to do this.

Further, although Dr. Sheehan acknowledges that he is somewhat daunted by knowing how to apply quality management principles to the complex AMHD system (compared to the simpler Kaiser system, where everyone is "under one roof"), he clearly is willing to exercise some leadership to move the system along. Dr. Sheehan has facilitated the development of a policy and procedure for engaging the statewide Medical Executive Committee in the process of quality improvement through the review of medical deaths and other clinical quality issues. This is an excellent step, though there is no indication that this process has yet begun. Further, as chair of the Quality Improvement Committee, Dr. Sheehan facilitated a discussion which led to the identification of the newly created "Warm and Welcoming Policy" as a defining value statement for implementation of the overall AMHD vision, that in one way or another (like the concept of ohana that I discussed in a previous report) related to all of the activities necessary for success, including the improvements in clinical care that relate to the critical incidents. These steps are good beginnings. Whether these activities will be continued in the next six months, and ultimately sustained, remains uncertain.

Second, Karen Krahn also has considerable QM experience, and although she is not a clinician, she has demonstrated that she knows how to approach problem solving from a data driven quality improvement perspective. It remains to be seen whether this approach will have demonstrable impact on system performance around critical elements in the Community Plan such as Crisis Response, Continuity of Care/Discharge Planning, and Treatment Planning.

Third, Helene Jo, as newly appointed QM Director, has considerable in depth understanding of the principles of Quality Management, and the design of an organizational culture based on quality. Further, Helene acknowledges that even though she understands the importance of working in partnership with providers and others in creating a quality culture, she often finds it hard, personally, to keep herself from behaving in ways that are inconsistent with that partnership. This raises the possibility that Helene, as well as Karen, might be open to clinical leadership and "supervision" from Dr. Sheehan in prioritizing clinical values in the quality improvement process, and implementing those values consistently in both clinical operations development and oversight, as well as in performance management/utilization management. This is consistent with the role of the Medical Director envisioned in the Community Plan, but not yet actually operationalized in AMHD functioning.

Fourth, I was very impressed with the evolution of the Quality Council. It has become a "real" group that is beginning to recognize its capacity to exercise meaningful power, and has strong consumer input. It has been very well managed and developed by Linda Appel.

Fifth, Eva Kishimoto has developed an excellent training manual on Warm and Welcoming that can inform the implementation of these values into clinical practice.

Sixth, AMHD organized specific technical assistance requests to the Evaluation Team that in my view demonstrated a real commitment to using quality improvement strategies to address some of the most important and complex clinical issues related to Community Plan implementation: recovery planning, crisis response, and continuity of care (hospital/community transitions). In addition, AMHD had created its own internal QM process to look at the continuity of care issue related to HSH and Kahi, as well as continuing the successful "Building Bridges" QI to address risk of loss of housing. Although there is much more work that needs to be done in these areas, and critical areas have not yet been addressed, the fundamental concept of continuous data driven performance improvement in relation to meaningful objectives seems to have taken hold.

However, although this is a promising start, there is much more work that needs to be done, and the time frame for demonstration of compliance in these areas (implementation of the Quality Management System and consume protection system) is short (March 15, 2006). The initial QM "vision" needs to be consistently applied to value driven problem solving. For example, one sentinel event that I reviewed ▮▮▮▮▮▮▮▮▮▮▮▮involved a woman in a group home who made an "unprovoked" attack on a staff person in the home. Review of the documentation indicated that the staff person had confronted the consumer shortly before in a rather controlling manner about needing to stop using the telephone inappropriately. This event could well have been prevented by engaging the consumer around the problem behavior in a "warm and welcoming" manner as a value-based priority. The need for this kind of training for front line staff is recognized (see below in the section on Housing Services), but has not yet been organized into full implementation as a system priority driven by quality improvement data to achieve Community Plan values.

- There needs to be an internal capacity to evaluate sentinel event and other critical incident data, as well as provider/consumer complaints, and to use that information to create systemic change. I reviewed ten sentinel event records, and discussed some of the salient quality improvement issues with Dr. Sheehan, but at present there is no documentation that indicates how these issues are being organized into quality improvement activities at the AMHD system level in a way that informs service development and oversight. I am particularly concerned that the only high quality critical incident reviews that I have seen (two cases) have been written by the Special Monitor.
- The Performance Management Director and Compliance Director positions are still vacant, and, in addition to a resultant lack of staff capacity to gather performance data, the quality of leadership that will emerge in those areas remains an unknown at this time. As noted above, evidence of routine tracking of sentinel event information into clinical review processes that result in both provider level and AMHD system level improvement activity is lacking at this time.

- The involvement of POS providers as partners in the QM system has improved somewhat, but is not yet commensurate with the extent of POS activity in the delivery of services over all.
- In this regard the recently revised policy on "Plans of Improvement" in response to Sentinel Events (revised December 2005) is mostly focused on Provider Correction, as opposed to describing how AMHD will function internally to work with providers to identify systemic issues that need to be corrected. Again, this kind of process is well illustrated in the Case Reviews done by the Special Monitor, but not within AMHD at this point.

In addition to the above administrative issues within the QM program, there are some significant clinical quality issues that are not yet fully being addressed. Probably the most important of these issues are "communication and collaboration between providers" and the quality of forensic programming for individuals on conditional release. These issues were highlighted in the case review performed by the Special Monitor, as well as in several of the cases that I reviewed personally.

Communication and collaboration was identified in my last report as an issue that had been raised repeatedly in the suicide cluster analysis, but did not yet appear to have an adequate quality improvement plan. The same issue was raised again in the case report written by the Special Monitor, and was a theme in some of the more recent critical incident cases that I reviewed. This issue was to some degree a component of the charge of the Continuity of Care committee, but the work of this group remained focus on the discharge transition, not on the larger issue of communication and collaboration in general. From my perspective, the Community Plan requires the development of a "system of care" that adheres to certain principles of clinical performance and consumer service. In this respect, organized interprogram and interclinician communication and collaboration need to be viewed as fundamental features of system design, and currently this is not the case. With a few notable exceptions, which I will discuss later, AMHD has not yet recognized officially that in order for interprogram communication to take place routinely and successfully, AMHD must create the infrastructure in which the programs can develop collaborative partnerships through shared responsibility for common populations or geographic areas, not based on the random activities of front line clinicians who relate with other random front line clinicians on an occasional basis.

Conditional release programming (or the lack thereof) has been connected as well to sentinel events, including the case reviewed by the Special Monitor. At this point, the development of such programming is now out of compliance with the required timeline (November 30, 2005) which contributes to the fact that CR patients are having poor outcomes (sentinel events, high readmission rates), and the state hospital census continues to rise.

Within the general framework of quality improvement, and the values of "warm and welcoming" recovery oriented services, AMHD therefore must demonstrate the capacity to internalize its ability to look at clinical and performance outcomes, to use those outcomes to identify system change targets, and to develop data driven processes that demonstrate success in achieving improvement.

**Utilization Management:**

Utilization Management continues to demonstrate progress. AMHD has finally filled the data entry positions. Consequently, the UM Specialists, under the leadership of Cynthia Means, have more opportunity to engage in technical assistance and clinical problem solving. One of the best examples of this is the creation of an "LCRS SWAT Team" to address the "stuck cases" in LCRS. This effort had demonstrable success in facilitating the discharge of a large number of long stay cases to free up beds for crisis admissions.

In addition, the consultant hired to review UM submitted a report in November 2005 that makes excellent recommendations for shifting the functioning and priorities of UM. These recommendations need to be adopted and implemented rapidly, as the timeline for compliance for UM is February 15, 2006.

What is particularly striking in the UM Consultant Report recommendations is how closely aligned these recommendations are with the Utilization Management system envisioned by the Community Plan, in which UM is intended to oversee service authorization in order to promote continuity of care, not to promote discontinuity and cost containment.. In particular, in the recommendations, there are specific strategies to shift the UM Coordinators into more of an in depth care coordination function to support discharge planning and hospital diversion for high need cases. In addition, there are clear (and not very complex) instructions regarding how to use utilization data to address issues of both under utilization (consumers underusing outpatient or crisis services; consumers not receiving authorized services) and over utilization. This approach is in direct contrast to the current emphasis in the AMHD system on a "managed care" reimbursement and cost containment approach to UM, with a focus on prior authorization, payment denials, and so on. Further, although there continue to be reports of improvement in some areas of prior authorization, there are also continued reports of the UM system still having administrative barriers to authorization of services, and payment for services. The question that has been raised previously in my reports – namely, why is there a need for AMHD to have such an elaborate authorization system to pay providers – remains un-answered.

Finally, there needs to be indication of the capacity of UM to evaluate whether consumers are actually receiving intensity of service that is matched to their level of need, without disruptive discontinuity of care. The use of the LOCUS as a measurement of "level of care" need is only a beginning to the question of whether clients are actually receiving authorized services, and whether what is being provided is adequate. Heretofore, the LOCUS as functioned more as a payment authorization mechanism than as a method of raising concerns about high need consumers not being well served.

In order for AMHD to demonstrate an internalized utilization management system that meets the requirements of the Community Plan to promote continuity and facilitate discharge transitions for complex cases, there needs to be visible, concrete evidence of implementation of the recommendations in the UM Consultant Report as quickly as possible, beginning with a comprehensive restatement of UM philosophy.

## Service Evaluation and Research: Management Information Systems and Data

The quality of the Target Population Reports continues to improve, and the current version appears to have accurate location of DTD consumers who are identified within the service system. There is an "At Risk" methodology being introduced that will permit more consistent up front identification of "At Risk" clients as part of the Target Population as well. Most important, AMHD is for the first time able to track actual utilization of consumers, not merely authorization. (I asked for this information for 15 recently discharged consumers, and received data for 12). This is the first step in meeting the Community Plan requirement regarding data tracking services actually provided.

There is improvement in the capacity to generate meaningful subpopulation data, though some of the data is still well behind the expected timelines. MISA data continues to be reported very well. There is a system in place for tracking consumers with forensic encumbrances, though this system is not yet linked into the basic MIS capacity. Homelessness data is being collected, but not yet at an adequate level of accuracy. The development of data on the MR population is also still a work in progress.

One bright spot is that the SERS Team has evolved in its ability to provide meaningful data to Service Directors and SAAs in their required planning documents. I was very impressed with Mike Wylie's organization of the "Data Buddy" system to link specific SERS staff with specific SDs and SAAs. I am recommending that each major QI project have an assigned "Data Buddy" as well.

## Provider Relations

As I noted above, the appointment of John Carollo as Provider Relations Director has been experienced as a positive development by providers, as John is an AMHD veteran who nonetheless is determined to be responsive to provider needs and concerns. John has conducted a more recent provider survey, the results of which have not yet been fully analyzed, but was reported by providers to be a useful process.

Although AMHD is now in compliance with the Community Plan with regard to the hiring of the Provider Relations Director, AMHD is out of compliance with "Implementation of Provider Relations", due November 30, 2005. Provider concerns continue, and in some ways, in spite of continued improvements in reduction of authorization barriers, have worsened. Most concerning, Dr. Hester's meetings were described as less helpful, because they had shifted from a private discussion where Dr. Hester was listening to provider concerns, to "just another opportunity for AMHD to come and talk at us" with announcements and the like. For the most part, my comments in the last report remain unchanged, as follows:

*All providers continued to report that in spite of very positive relationships with SAA s and particular Service Directors, they often felt frustration with unclear and inconsistent policy implementation by AMHD, continued to have experiences of being treated more as "non-compliant children" rather than true partners, and experienced recurrent instances where the UM philosophy seemed to be the major driver of decision making rather than the clinical values and vision of the Community Plan. In addition to the above, my observation is that POS providers are not yet in fact included in the system design as full partners with any degree of consistency. As noted in my previous report, AMHD has not provided consistent direction with regard to how to organize a system of care for consumers in which the expectation is that POS providers (and other non-AMHD providers, like community hospitals) are routinely organized into a continuum.*

*Examples include: what is the regular structure for coordinating care between AMHD clinics and POS providers who offer a range of services (from ICM to housing) for the population of shared consumers in a particular geographic area? What is the organized way to create a structure for forensic coordinators who have overlapping caseloads of both CMHC and POS clients? What is the organized mechanism for treatment planning when the consumer has a CMHC psychiatrist and a POS ICM worker? There are areas of "local" initiative around these critical issues (see below), but as yet, there has been no system vision about how the different types of providers are best coordinated into a system of care in any area; ....It is now important that AMHD leadership provides concrete structure to promote team building at the local system level. As noted above in the discussion of performance management and sentinel event review, the issue of poor communication between multiple providers sharing clients has been flagged repeatedly, but not yet addressed comprehensively as a system wide improvement issue.*

Further, AMHD has an array of unique providers, some of whom are particularly organized to meet the needs of diverse local cultures. I was very impressed with the work done to modify one of the EBP toolkits (Illness Self Management and Recovery), in partnership with the Waianae CMHC to develop a version of that toolkit that was culturally appropriate for Native Hawaiians. However, AMHD continues to struggle with providers that are unique in their capacity to deliver innovative and culturally relevant care, when opportunities for more creative partnerships need to be developed before struggles emerge.

**N.B. Consumer Affairs and Multicultural Affairs will be addressed in more depth by other members of the evaluation team.**

## PART II: SERVICE DIRECTOR ACTIVITIES (INLCUDING AMHD OPERATED SERVICES)

### Crisis Intervention

At the time of the visit, Steve Balcom, who has prior mainland experience with management of crisis services, had recently been appointed Crisis Services Director. I view this as a very positive step. However, the statewide Care Hawaii crisis contract had only been implemented four days before our visit, and we were told that the contract did not finalized until November 30, when roll out had to occur the very next day. In addition, no preparatory work for implementation had been able to take place until the contract was finalized, perhaps because AMHD was already in arrears in payment to Care Hawaii for other contracts. This will make it very difficult for AMHD to achieve full implementation of a crisis services system statewide by the deadline of April 15, 2006

In my previous report, I stated that the new conceptualization of crisis services as a statewide clinical function with a continuum of care and a locus of clinical responsibility held by an accountable vendor represented a positive step in addressing serious deficiencies in crisis response. Further, I observed that Steve Balcom appears to share this vision of the importance of proactively accessible and accountable services, and that this vision is actively supported by Karen Krahn. There were notable efforts to get crisis services up and running effectively despite the short time frame for roll out. In particular, Steve Balcom was personally reviewing every CMO case to assure quality of response, and he and Karen had begun to design a quality monitoring process for contract

performance that would be on line in real time as the contract process unfolded. Efforts to proactively engage the Queens ER in identifying clients in the ER who could benefit from CMO had been developed as the result of ongoing meetings, and were in the process of being implemented. Finally, AMHD organized a technical assistance request regarding crisis services that appeared to indicate a strong willingness to invest in the success of this new endeavor.

Nonetheless there are many concerns about the current operation of crisis services, and a relatively short time line to ensure that the crisis service becomes operational in a manner that addresses the previous difficulties in crisis service development.

First, it is concerning that a service as critical as crisis intervention was rolled out with so little advance preparation.  While it appears that there were efforts to inform providers and service recipients of the change, it was simply not possible to adequately inform everyone of all the necessary information.  This was illustrated in a meeting where a homeless outreach provider was requesting contact information for Care Hawaii's phone back up system, and no one at AMHD knew the number.

Second, there needs to be adequate provision for clinical and psychiatric back up and oversight of the provision of services.  Currently, Care Hawaii has contracted to provide such back up with one QMHP and one psychiatrist on call for the whole state. This would be inadequate to provide close supervision for each crisis event, which would seem to be essential in beginning a new service with this level of complexity.  Linda Mattice expressed willingness to expand the frequency and depth of back up coverage, but this of course was not yet implemented at the time of my visit.

Third, there needs to be a consistent locus of responsibility for continued follow up and clinical oversight of crisis situations.  I reviewed documentation from five crisis cases (from before the new contract implementation) and while I was impressed in general with the clinical work performed by the CMO workers, I noted that there was no consistent mechanism for tracking or following up dispositions. For example, one psychotic client was referred to CSM, but there was no data regarding whether she actually made contact. Another case involved a complex situation at a residential site which was insisting on hospitalization, a situation which appeared to require follow up for consultation and continued intervention after the initial CMO. The Crisis Services Director informed me that he had followed up on this event, but as yet there was no routine process for follow up built into the operation of the contracted Crisis Response.

Fourth, crisis services need to be proactive.  At the time of my visit, the information about the new service, and its new philosophy of responsiveness, had not yet been disseminated.  Instructions about the connection between crisis response by CMO and crisis response by assigned ACT and ICM teams had not been worked out in detail, although Steve Balcom stated he had provided instructions to authorize CMO whenever there was any question of response. The project with the Queens ER was a positive example of attempting to reach out for more crisis referrals, but even in that situation there was no proactive effort to identify every potential crisis case coming through the ER.  Further, there needs to be an extensive process of educating every clinician and consumer about the importance of having a low threshold for reaching out to access crisis services.  One thing I noted in reviewing the crisis cases was that referrals from outside the AMHD system seemed to be presenting earlier in the crisis sequence than cases

already engaged with AMHD. Further, in several sentinel event cases I reviewed, I noted how difficult it was for individual clinicians to feel that there is value in contacting crisis since they often experience no real responsiveness in terms of access to crisis admission. This was clearly noted in the case review done by the Special Monitor. In addition, many case managers have not been trained in recognizing the importance of encouraging crisis intervention and evaluation. In one case I reviewed ███████████, a consumer attempted to hang himself but was unsuccessful because the rope was too long; the case manager regarded this as "a gesture" because the rope was too long, and did not take it seriously until instructed by a supervisor.

Fifth, the continuum of care needs to be established. There were still many gaps in the implementation of various services under the new contract. The services on Kauai were just being negotiated, and the relationship between the new service and the coverage provided out of Wilcox ER by Wayne Law and Jan Overland had not been clearly defined. The relationship with Aloha House LCRS on Maui was also up in the air.

Sixth, the design and responsiveness of crisis services has to inform the creation of universal crisis planning for consumers, which is a very specific requirement of the community plan. Currently, consumers do not, in general, have meaningful crisis plans in their treatment plans, and are not provided with specific instructions on how to identify early signs of decompensation and access help before there is a serious adverse event. In order for such plans to be developed, it has to be clear that if a consumer contacts the crisis service, they will get a consistent response, both from ACCESS, and from the clinical team. One of the sentinel event cases I reviewed was a woman who committed suicide, and had no documented crisis plan in her chart (see below).

As I noted above, I observed a strong commitment on the part of AMHD to address each of these issues. However, there is a lot of work to do to achieve compliance in four months.

## Case Management

As during my previous visit, Case Management Coordinator positions remain vacant in two locations. However, case management ratios have improved in several sites, as a result of new hires, and of implementation of more flexible caseload assignments. Nonetheless, the case management ratios remain out of compliance with the Community Plan over all.

There is no evidence of improvement in ICM functioning, and the comments I made in my previous report still stand.

Since our last visit, AMHD has been attempting to engage in quality improvement activities regarding continuity of care, and in so doing, exploring the role of the case manager in this process. The continuity of care QI committee demonstrated months of hard work, involvement of many stakeholders, both AMHD and POS, and a clear effort to try to address some longstanding issues regarding continuity of case manager involvement, forensic services, and medical care. New policies and procedures have been recommended for increasing case manager participation in HSH/Kahi treatment and discharge planning, but as yet there has been no data demonstrating either implementation or progress.

More important, AMHD is just beginning to recognize that it has to deal with an even more fundamental issue, which is the dilemma of building the responsibility for managing very complex cases with multiple providers (often with different agendas and priorities) into the role of case managers who are often the least skilled and least empowered individuals in the treatment process. Designing case management services, treatment and discharge planning activities, and continuity of care interventions must incorporate the importance of connecting case managers (of whatever level of intensity of service provision) with a "team" that owns responsibility for the client under the leadership of the physician, builds relationships with other providers that routinely share care, and thereby supports the day to day activity of case managers to implement the shared treatment plan, One member of the AMHD executive team suggested that high risk discharges from HSH may actually require an even higher level of oversight and team work, involving a "Discharge SWAT Team" that closely manages the case with front line clinicians and is empowered to engage every resource in the system if needed to help the consumer succeed. Given the consistent finding in sentinel event reviews that interagency coordination in crisis situations is routinely problematic, and that case managers clearly cannot overcome this unilaterally, it would seem that developing a system based on the Community Plan that keeps consumers safe and prevents re-incarceration, would require that these types of team based mechanisms are more actively developed at every level.

## Treatment Services

Description of the status of AMHD in "providing treatment services at the appropriate level", in relationship to the April 15, 2006 deadline, is provided in the grid attached to the Court Evaluation Team reports.

This section will include discussion of ACT (now fully under the domain of the Treatment Services Director), Medical Services, Hospital Services, and Treatment Planning. The new MI/SA specialized continuum contracts are now functioning, but I did not have an opportunity to review their performance, or any other specialized residential services being developed. None of the services mentioned (other than MI/SA) is making sufficient progress at this time to be able to achieve compliance by the April deadline.

**Assertive Community Treatment:** There has been noticeable progress in the development of ACT since my previous visit. Kathleen Yoshitomi has been taking a direct role in overseeing ACT development. AMHD has provided on site evaluation, consultation, and technical assistance to ACT teams from out-of-state (Indiana) consultants, which was, for the most part, very well received. AMHD has also demonstrated willingness to explore more flexible payment arrangements that support ACT activity without having face to face contact be the only means of generating revenue; much more work needs to be done in this area however. There are more realistic assessments of ACT performance that are being used to guide the development of ACT as a team treatment service that is pretty much all inclusive. ACT clients are now being tracked for clinical outcomes. In my visit to one of the Care Hawaii ACT teams, it was clear that the team had internalized this training and consultation, and was making an effort to organize itself to perform differently. It was also clear that this process was still relatively early in development. The ACT team was able to report on a treatment success

with this team based approach, and described remarkable progress in a target population case ██████) who was also in Care Cottages. I reviewed the chart of this client, and observed that the treatment plan showed evidence of improvement in incorporation of the trainings provided by Dr. Mee-Lee and Dr. Batzer, and was therefore more in compliance with Community Plan expectations than previous plans I had reviewed, though still not fully compliant. Another case (███████) was discussed which reflected a lack of success with a highly dangerous target population client who had forensic encumbrances was not very well monitored and had refused care. The ACT Team was unable to locate this client, and were expecting him to be arrested again; they felt there was little that they could do without more active support from AMHD (particularly forensic services), and they had no mechanism in place to know how to figure out another plan. My conclusion based on this visit is that while ACT has clearly improved, there is much more work to be done before ACT will be satisfactorily implemented, and it will be very hard to achieve that goal in six months.

**Medical Services:** As noted above, Dr. Sheehan is making a commendable effort to re-establish the SMEC as a true medical quality oversight body. I was impressed with Dr. Sheehan's ability to organize the physicians' meeting to achieve a productive outcome, rather than simply re-hashing complaints. Another positive step is that the CMHC Medical Director positions have been approved, and all but one position filled. Chart reviews of CMHC activity indicates that the MDs do provide clinical leadership in cases. The functioning of POS Medical Directors in their programs is less well defined.

The HIMAP implementation pilots continue, but there is little progress in achieving full implementation at any site. Hiring peer support workers has still not been completed.

I am pleased that the Continuity of Care QI team addressed mechanisms for improving medical care continuity, and Dr. Sheehan will be tasking the SMEC with reviewing medical deaths. It is unfortunate that issues related to continuity of psychiatric care have not yet been addressed as a QI issue, since in one sentinel event I reviewed (████████), it was very concerning that a patient discharged from HSH had four possible MDs responsible for his community care, and none clearly identified as such. The Community Plan emphasizes the importance of the psychiatrist as the leader of the treatment team; AMHD needs to figure out how to organize and empower this leadership for the many many consumers who overlap different agencies with different clinicians and physicians.

**Hospital Services:** Some progress has been made in contracting with hospitals. Helene Jo has taken over the contracting process, and it appears that the hospitals have agreed to the general terms, but many of the details have not been finalized. AMHD has approached this problem wisely, in not creating demands in the contract that the hospitals would resist, but rather focusing on using the contracting process to build a more formal partnership in the system. Given how often target population cases (both through sentinel event review and re-admission review) have adverse outcomes due to inability to have timely access to acute care, addressing the development of acute bed capacity in partnership with other system services (especially crisis) is critical. This is still, unfortunately, just beginning.

Another issue related to hospitalization in general hospital settings has to do with managing "stuck" cases. I was told about a "successful" transfer of a very complex

patient from Queens to Leahi after a longer than one year admission. I was involved with discussing the potential transfer to HSH of another challenging consumer at Queens, perhaps as part of a trade with HSH to step down another consumer. The existence of these efforts is positive, but there are not yet any smooth mechanisms for moving consumers through the continuum of inpatient services quickly to maximize access to acute beds. This also needs to be developed further.

Last, but certainly not least, is the issue of hospital oversight. It was very clearly stated in the dismissal of the HSH portion of this case that AMHD was expected to continue oversight of both HSH and Kahi. While some oversight has continued, it has not been at the level that I would expect. I reviewed one sentinel event case that was an elopement from HSH (████████), indicating that AMHD is indeed monitoring hospital related sentinel events, but I could not find indication about how that review was connected back into the HSH oversight process. My observation based on the documentation provided is that AMHD is not routinely tracking every significant element of the Remedial Plan, which is particularly critical as the census at HSH continues to rise well beyond the level it was when the case ended there. The Wiener Reports have ended, and not been replaced. A particularly illustrative example was the temporary closure of the mall in July. Although I was told that there were discussions between AMHD oversight and HSH leadership about how to ensure programming would continue, I found no documentation of these discussions and no evidence of AMHD tracking this programming beyond HSH self report.

**Even more crucial, what is being done about the steadily rising HSH census? Ordinarily one would consider the current situation to be a crisis, and, given the data on the high number of re-admissions of individuals with forensic encumbrances, there would be a re-creation of a SWAT team approach to develop better forensic services, and more close oversight of each and every discharge or potential discharge. None of this, unfortunately, is taking place.**

**Treatment Planning:** AMHD is very appropriately concerned about how far behind the time line treatment planning development has become, and requested specific technical assistance from the Evaluation Team in this area. Karen Krahn appears to have taken ownership of creating a team at the AMHD level to oversee the further implementation of the treatment planning requirements (including crisis planning) which are very specifically delineated in the Community Plan. The new due date is February 28, 2006, and my observation is that even with all best effort at present AMHD cannot meet that deadline.

At present, what I have observed, and what AMHD has recognized, is that there was a significant amount of training provided in the last year by David Mee-Lee, MD and Wayne Batzer, MD, along with an effort to create a team of "treatment planning champions" in multiple sites. While the training had excellent content in relation to the type of treatment planning that is expected by the Community Plan, it was ultimately experienced by many clinicians as frustrating, because there was no organized alignment of expectations for performance, structured into a consistent quality improvement process, to assist each program or agency to know how to take the next step in treatment plan development. Currently, therefore, although there is progress as a result of the training, the progress is pretty random, and AMHD has not developed the overall capacity to organize the process to move it forward to achieve more consistent results.

For example, in the treatment plans I reviewed at Maui CMHC, it was evident that the "treatment plan champion" (Sue Stone) had been doing considerable work to teach everyone about how to do a good treatment plan, including incorporation of a typed formulation (!!!), and a crisis plan, as well as attention to MISA issues.  Similarly, ACT team treatment planning (in the teams that had been receiving ACT training) also demonstrated significant improvement in relation to Community Plan expectations. On the other hand, treatment plan documentation from the CMHCs (reviewing sentinel event cases) did not demonstrate this kind of progress, nor did the ICM case reviewed from Care Hawaii (who acknowledged that they had only just begun to focus on treatment planning improvement with this program).  In fact, in one sentinel event case I reviewed ████████████, a patient at a CMHC who committed suicide in April 2005, there was excellent progress note documentation, but the treatment plan review due in December, 2004 had not been done, even though the patient was being dropped in level of care while under considerable stress, and there was no crisis plan documentation anywhere.

I want to reiterate in this report the specific elements of treatment planning improvement activities that I included in the last report, as they are still salient:

1. An implementation plan that defines targets for treatment plan improvement, based on internal assessment of current baseline performance, and empowers a specific leader or leadership group to oversee the details of implementation.

2. Involvement of Performance Management in the process of developing a treatment plan "audit tool", a mechanism for working with each provider to begin to monitor its own progress, methods for tracking improvement, and availability of on site technical assistance.

3. Communication to clinicians of how the treatment plan training is expected to translate into their own practice.  Many consumers expressed concern that although they had heard the rhetoric of "person-centered" planning, the staff they dealt with often did not seem to understand how to put that into practice.

4. Collaboration with service directors for case management and housing regarding treatment plan expectations in those areas, and with service director for crisis services to define what a crisis response plan should include, as part of the treatment plan, and collaboration with service directors for MISA and forensics regarding incorporation of appropriately matched interventions into treatment plans around those issues.

5. Development of a framework for developing organized team based treatment planning when the "clinical team" may include representation from different providers (e.g. a CMHC MD and an ICM case manager). This was specifically identified as an issue in Mee-Lee's report.

6. Development of treatment planning content and documentation requirements that corresponds to the level of consumer need.  This is an evident difficulty in the recommendations in the Suicide Cluster Action Plan for "treatment plan revision" for ACT clients in crisis to be more often than every six months (when ACT treatment plan updates need to be operationally done daily or weekly) without any delineation of the

       appropriate level of detail that should be present in such a plan, particularly in relation to crisis response.

7. Linkage of the treatment plan improvement process to specific issues identified in other performance improvement activities (sentinel event review, suicide cluster, conditional release tracking, dropped cases, building bridges regarding housing retention, and so on).

At present, I expect that AMHD will begin to organize treatment plan improvement activities in a more coherent manner, and to develop the internalized capacity to both support and measure progress. However, the success of this activity will inevitably take more time than the two months available to achieve current timelines for implementation. It is unfortunate that this systematic treatment plan improvement activity did not begin much earlier in the timeline of Community Plan implementation.

## Housing

Requirements for development of housing services have been met, for the most part, including the implementation of the array of housing models described in the Community Plan. The major problem at this point is the development of adequate availability of housing to meet the needs of the target population. The deadline for the implementation of the full housing array is well past, however significant progress has been made, and in my opinion, as described below, the development of adequate housing availability is primarily impeded by lack of progress in other areas of the AMHD system.

In my last report, I wrote the following, which is still appropriate to the status of housing development, with the bolded changes included:

"I continue to note progress in housing development, and want to recognize Bernie Miranda for her accomplishments in this area. Areas of improvement include:

1. Continued expansion of housing resources. Although there is still a relative deficiency of housing for highly impaired individuals, the availability of housing has essentially doubled during the past few years. This is an impressive accomplishment.

2. Implementation of a policy defining zero tolerance for homelessness. The operationalization of this policy is connected to the recognition that when consumers lose their housing it is a "sentinel event." **This has been more clearly established at present.**

3. **Continuation and expansion** of the "building bridges" project as a quality improvement initiative to raise the Executive Team's level of awareness of individuals who have lost or who are at risk of losing housing, and to begin to design "crisis response" interventions to prevent homelessness. **This project has begun to demonstrate positive outcomes.**

4. **Initial** implementation of "damp housing", and beginning to identify resources according to their approach to substance use in the housing.

5. Continued activity to maximize access to housing funds and resources."

The Community Plan expectation to "establish the full continuum of housing" is a considerable challenge, and it is continually reported that AMHD needs "more housing", particularly more staffed housing options for target population consumers. Nationally, the trend in development of housing for consumers with severe and persistent mental

illness in recovery oriented systems has shifted away from 24 hour group homes, however, to the development of more highly flexible independent living environments with intensive "ACT level" wraparound services, often for high risk consumers who may be actively using substances (e.g., Pathways to Housing, referenced in my last report). Consequently, as AMHD continues to add housing resources, it is difficult to assess the extent to which AMHD needs to develop more of the same kind of housing, or actually begin to develop more housing in line with the Pathways to Housing or similar models. This difficulty is connected directly to the lagging development of ACT, in which there is as yet inadequate clinical and financial/billing capacity to do aggressive outreach with homeless consumers, and to provide housing wraparound services to individuals living in independent settings who are unstable. This is also directly related to the lack of development of conditional release programming, so that consumers with forensic encumbrances can be tightly monitored in a manner that uses available contingencies to support their success in housing, as well as in other areas of their recovery. Several of the sentinel event cases I reviewed, (e.g., ██████████ ██████████, ██████████) indicated how quickly consumers could become unstable and lose their housing placement, without the ability of involved residential services, ACT teams, crisis services, and forensic services to have a previously developed plan to catch the consumer immediately as he or she began to slip, to intervene intensively using the available support and leverage to keep the consumer engaged.

Currently, the initial development of "damp housing" is positive, but it is clear that there is as yet no well developed set of policies and procedures for how to design such housing situations, and to teach staff how to work with consumers in those settings in a way that engages them constructively in better decision making with additional support, rather than just giving them "permission" to use until they get into trouble. The solution to this issue will involve collaboration between MISA and Housing services.

In addition, the collaboration between housing providers in receiving training on clinical skills (e.g., "welcoming", as noted earlier) and in developing collaborative treatment plans so there is a proactive structure for ensuring coordination between housing services, case management services, under the coordinated leadership of the psychiatrist, simply is not present. Bernie Miranda is highly aware of these issues, but is limited in the degree to which they can be addressed without organized connection with the rest of the AMHD service system.

Further, homeless outreach providers, particularly in Oahu and Hawaii, experience themselves as quite disengaged from the rest of the service system. They report that it is easier now to obtain eligibility in order to get "case management", which is perceived to be a requirement to access AMHD housing services, but there is frustration with the lack of proactive crisis response, and experience that once clients are referred to AMHD case management, they often do not successfully transition, and remain connected with the homeless providers. One of the sentinel events I reviewed on Mau (██████████) indicated the difficulty of a consumer engaged in CSM, being hospitalized, discharged, losing his placement, and becoming homeless again, over a period of a month, without being able to be connected to continuing care, requiring intervention (very appropriately so) from the SAA, but still indicating a common dilemma in helping homeless consumers transition into care. There was discussion in one meeting I attended of consideration of maintaining continuity with homeless outreach

settings while promoting access to housing resources and medications, without needing to create an administrative need for a "handoff" that might prove unsuccessful. Once again, issues related to continuity of close management to help high risk consumers achieve success are integral to developing a solution for those target population or at risk consumers who are homeless.


## MISA

As with Housing, I want to reiterate and update my last report concerning MISA services: changes are again in bold:

"The accomplishments within the MISA service area have been  substantial, and Eva Kishimoto, **the MISA coordinators, and the COSIG team** deserve significant credit for having moved so many activities forward, in addition to Eva attending to other "special population" issues (like working on the MOA for  DD services, **which is now nearing completion, expected January 2006**). Specific accomplishments include:

1.  Initiation of universal screening and improved data collection and recognition of the MISA population
2.  Creation of a plan for universal attainment of Dual Diagnosis Capability, and beginning activities at each CMHC to move in this direction.
3.  Development of an effective team of MISA coordinators (though some positions are now vacant and one position has been detailed to other functions).
4.  **Development** of MISA Pilot as a vehicle to organize an interagency care coordination team to build coalitions and plan system development on the Windward side of Oahu, with facilitation provided by the MISA clinical consultation team. The team **has focused** initially on the pilot, and **now has begun to** expand consultation and technical assistance to become a more system wide resource.
5.  Initiation of the Integrated Dual Disorder Toolkit at three pilot sites, as a vehicle for modeling the development of EBP services for MISA consumers in the context of Dual Diagnosis Capability Development for each CMHC.
6.  The **ongoing** implementation of MISA Treatment Programming continua of care in response to the MISA RFP referenced in previous Evaluation Reports.
7.  **The development of culturally appropriate dual diagnosis programming working with an addiction provider on the Waianae Coast.**

Now that so much progress has been developed <u>within</u> the MISA domain, in part supported by the COSIG and IDDT grants, it is now **essential** that MISA can be organized to provide the same leadership, engagement, team building, and consultation within the entire AMHD system. The new role of Karen Krahn may facilitate this process, as well as the adoption of the MISA generated "Warm and Welcoming Policy" as an overarching system value. Why is this coordination so important? First and foremost, in addition to the Community Plan expectation of developing MISA services throughout the continuum, all the other significant community plan requirements cannot

occur without building upon what has been learned from the expertise within the MISA service array, as follows:

1. In the cases I reviewed, the majority of sentinel events involved substance abuse related issues, and even more so in the ones with forensic encumbrance. At present there has been no effort by forensics to routinely incorporate MISA expertise in the development of conditional release programming.

2. The identification of substance abuse has significantly improved, but it was still striking that the CMHC consumer referenced above who committed suicide had cocaine and codeine in her blood when she died, and no history of substance use documented in her record.

3. POS providers in ACT and ICM are dealing with the highest severity of MISA clients, but are not routinely linked with MISA coordination activities in an organized and systematic manner. The mechanism for achieving this linkage has to be figured out at the Executive Team level.

4. HSH discharges are commonly re-admitted and/or re-offend due to substance relapse, so that the expertise of the MISA system needs to be fully engaged in improvement activities regarding discharge planning and continuity of care.

5. Improvement activities for crisis planning, treatment planning, and housing development, all involve MISA issues as a high priority issue, and can be significantly informed by the growing expertise of the MISA team..

6. The MISA pilot has learned a significant amount about the development of a service network in the Windward Area and how this can be advantageous to coordination of treatment planning and improving outcomes for unstable and high risk consumers. This experience must be used as a model for designing similar networks to manage complex consumers in other geographical areas.

7. The new MISA providers (e.g., Sand Island) have to be "integrated" into the AMHD provider community as significant contributors to the continuum of care, and ensure the development of appropriate linkages with crisis services, forensic coordinators, MISA coordinators, ACT and ICM, etc.

8. Last, but certainly not least, the "Warm and Welcoming" training developed by MISA needs to be exported as the beginning of AMHD's implementation of a value driven system, and linked with cultural competency development as a component of welcoming. (Interestingly, even though the Waianae Coast CMHC developed Hawaiian culture appropriate illness self management tools, and the nearby addiction provider developed culturally appropriate co-occurring disorder programming, the two "Hawaiian" agencies don't regularly communicate, because one is mental health and the other addiction services; this too needs to be addressed more systematically.)

I want to reiterate that this is not a critique of MISA services; this is recognition of the strength of MISA services, and the need for those elements to be fully integrated into the achievement of the requirements of the Community Plan.

**Forensics** (primarily addressed by Gail Hanson-Mayer, RNCS)

In contrast to the progress noted in Forensics in my last report, at this point Forensic Services are dramatically lagging, and significant progress was not evident in

the most important areas that need to be addressed to achieve compliance with the Community Plan  Many of these areas are now out of compliance, as the deadline for completion of November 30, 2005 has passed.

The most positive area of progress is the work of the Forensic Coordinators, who continue to be effective in tracking most forensic cases, are individually becoming better connected with their clinics, developing relationships with more POS providers through shared clients, and starting to function as a team, particularly on Oahu (just beginning on Hawaii).  Individually, the forensic coordinators are developing creative approaches to working with complex clients, and have been able to achieve some successes with difficult cases.  Finally, the forensic coordinators are maintaining a relationship with the HSH Forensic Coordinator, which can facilitate discharge planning of forensic cases, and there are better procedures in place for information sharing about court appearances, court orders, and so on.

Further, there is indication of continued progress in the area of Mental Health Court development and Jail Diversion, though planning for Secure Forensic Residential Services has stalled, and there is little progress on development of model court orders and promotion of utilization of civil commitment to forestall criminalization.

Most concerning however is the total lack of progress in the development of conditional release programming, when this is not only a specific requirement of the community plan that was due on 11/30/05, the lack of such programming is a major contributor to the increasing census at HSH.  The following findings underscore this concern:

1. Response to documentation requests from the Forensic Services Director was minimal, at best.
2. There is no clear accountability for Forensic Services programming development in AMHD's own action plan, and I heard reports of struggles between Wayne Law and Reneau Kennedy about their respective areas of responsibility for forensic services.
3. The Forensic Coordinators stated that it was their expectation that CR programming was to be developed by AMHD, not at the clinic level, and they were developing individual approaches while waiting for that to occur.
4. Dr. Kennedy no longer participates with the other service directors and SAAs in the coordination meetings held by Karen Krahn. Lack of coordination between Forensic Services and other areas was a problem in previous visits, and it is more so now.
5. **Most important, lack of CR programming is a major contributor to sentinel events and to HSH readmissions.** Specific cases I reviewed in this regard were cited above (██████████ ██████████ ██████████. The case review performed by the Special Monitor illustrated this problem in great detail.

**The seriousness of this issue cannot be overstated.** AMHD is most significantly past (or about to be past) the due dates  for compliance in an area of increasing clinical relevance to the provision of successful community based care in the entire system, the lack of which is contributing to a significant percentage of early re-admissions to HSH, which is dramatically over census.  Further, there was no evidence at

this visit that this problem is being meaningfully addressed. At this point, it is not clear whether even dramatic action can assure compliance by June 30, 2006, the date for complete compliance with the Community Plan as a whole is expected, but certainly without such action compliance will be impossible.

**Rehabilitation Services** (addressed by Gail Hanson-Mayer RNCS).


**CMHC Services** (primarily addressed by Dr. Paul Gorman and Gail Hanson-Mayer, RNCS)

During this visit, I only met specifically with Medical Directors, and no other CMHC staff. I did meet with Wayne Law and Troy Freitas regarding their plans to build a quality improvement culture in the CMHCs, and am impressed with their efforts to create a viable staff council to empower more front line clinicians in promoting change. There is a reasonable possibility that significant progress toward compliance in many (but not all) areas of CMHC functioning can be achieved by June 30, 2006. In particular, the process of combining different levels of case management has potential for more efficient resource utilization and possibly better continuity of care for consumers, but it is still not clear that expected staffing ratios will be consistently met. There is a plan in place for supervision using PAS, but it does not appear to be meaningfully implemented, and there continues to be a need for better supervision of Clinic Directors. Information received from multiple sources regarding the progress of "mediation" at Windward Clinic indicates that this process is not going well at all; more decisive action is needed. On the positive side, a new clinic director has been hired at Diamond Head, which will free up Wayne Law for clinic administration, and hopefully stablize clinic leadership there. There has been progress made on space issues since our last visit, as well.

The most important priorities at the clinics, for quality improvement, involve developing the organizational structure, and the role of the various coordinator positions, to function as a meaningful team at each site. Within this framework, treatment planning and crisis planning, as well as developing routine mechanisms for coordinating care with POS providers within the treatment planning and crisis planning structures, are the most important priorities. In general, however, there has been little progress in these areas as yet, except in individual clinics.

As noted earlier, the Medical Director positions are no longer acting, and most positions are formally filled. Dr. Sheehan is beginning to provide more organized supervision for the Medical Directors as a group, though stressful and even intolerable relationships between some Medical Directors and Clinic Directors continue, particularly at Windward, as noted above.

### PART III: SERVICE AREA ACTIVITIES

**Kauai:** At the time of our visit, the SAA position for Kauai remained vacant (with Flo Dunn O'Neil continuing in her acting role), but I was informed that there was a candidate for the position and hiring was imminent. The deadline for completion of hiring of all four SAAs is March 31, 2006, so if this position is hired as planned, this area will be in compliance. In addition, a new permanent clinic director

for Kauai CMHC has been hired, who has considerable experience in managing public mental health services on the mainland.

With this new leadership in place will come an opportunity to more comprehensively organize the emerging service array that is being developed on Kauai, in line with meeting Community Plan expectations. Since my last visit, some regular clinical meetings between clinic staff and physicians and housing providers have begun, for the purpose of better care coordination. Additional housing services are being added, and soon there will be an entirely new continuum of crisis services managed by Care Hawaii. Considerable effort will be required to organize this service array with multiple providers into a coherent "team" that continues to carefully and closely manage the care delivered to Kauai consumers. The type of provider networking that is beginning to emerge in Maui can be a model for this type of activity.

**Maui:** In my previous report, I identified the emerging capacity for interagency coordination on Maui as a model for AMHD to replicate in other geographical areas, as a mechanism for addressing the repeated problems with communication between providers sharing complex cases. To date, AMHD has not done so. Nonetheless, under the leadership of Tom Vendetti, the interagency provider network on Maui has continued to meet, and the quality of their collaboration has continued to improve.

In my visit to Maui, I noted increasing energy and morale in the CMHC team itself (as well as in its relationships with other providers, as will be described below), improvement in the quality of CMHC treatment planning (as I noted above), high levels of involvement of the MISA Coordinator and newly hired Forensic Coordinator in the team at the CMHC, and developing relationships with other providers. In addition, Dr. Balog reported positive developments in plans to organize treatment planning with POS providers, including a commitment to try to use a common treatment planning form, which had been a very problematic area on previous visits.

I attended a meeting with all Maui providers, and what was noteworthy was that it was clear that as a group they had been developing the capacity to talk among themselves more openly about solving difficult problems. This does not mean that there was complete harmony, only an emerging capacity to solve difficult problems together. Out of this work had begun to develop a sense of collective ownership for caring for the consumers in the community. I was very impressed with the new leadership at MHK on Maui, with the growing confidence of the clubhouse as part of the continuum, the developing partnership between the clubhouse and MHK's PSR program to organize choices for consumers, the improved linkages between homeless outreach, crisis services, the CMHC, and ICM. Consequently, in addition to the expansion of resources on Maui for housing, the emergence of Interim Housing at the Maui Dream Inn, the planning for hybrid ACT, the initiation of the MISA continuum at Aloha House, and the development of jail diversion, services may be more efficiently utilized because of better coordination of care. Much work needs to be done, but this type of service delivery organization is essentially what the Community Plan is designed to achieve.

**Oahu**   As I noted in my last report, "Linda Schladermundt Appel has continued to demonstrate energy and leadership as a problem solver and facilitator on Oahu, and deserves a lot of credit for her availability – particularly in such a complex system – to consumers, family members, advocates (SAB) and providers – to negotiate solutions to problems to the best of her ability. Linda has provided considerable assistance to the Executive Team to facilitate the use of Quality Improvement processes to solve real clinical problems", and has provided crucial leadership to the Continuity of Care QI Team, and to the Quality Council.

The need for better service coordination between providers on Oahu remains a critical issue, particularly with repeated sentinel events in which cases provided with extensive resources simply fall through the cracks between multiple providers with unclear relationships and no partnership. The sentinel event reviewed by the Special Monitor illustrated this quite dramatically, by describing the difficulties of managing a client in Po'ailani in Kailua by an ACT Team on the Waianae Coast.

With additional staff, Linda may now have the resources to create models for service organization on the island that may inform assignment of consumers, and promote better management of HSH discharges. One opportunity may be to assign one of her staff to participate in the COSIG "pilot" project on the Windward area of Oahu, and to learn from this how to organize other parts of the island. SERS provided the evaluation team with geographic maps of the service array in geographic "areas" (defined by clinic catchment area) on Oahu, raising the possibility of planning routine geographic linkages between multiple providers for the purpose of coordinating care more effectively.

There is no specific model that AMHD must follow to organize services to meet the requirements of the Community Plan, but services must be organized effectively so that lack of coordination between providers is not a consistent contributor to sentinel events and HSH re-admissions across the system of care.

**Concluding Framework: AMHD's Clinical Care Delivery to Consumers:**   In my last report, I wrote the following, with regard to the impact of the AMHD system on the consumers it serves: *It is always important to remember that the first priority of the Community Plan is to develop a system of care that engages consumers in a strength-based, humanistic, person-centered recovery process.... This relates most fundamentally to the vision of services organized so that they are neither inaccessible or discontinuous, but rather emphasizing that the priority of AMHD should be to create a model for clinical care delivery embodied in organized consistent teams that work together regularly in a structured manner to create person centered treatment plans.*

*The idea of person-centered recovery-oriented services goes to the heart of clinical relationships that wrap around consumers in crisis, at risk of homelessness, who are in trouble in their treatment programs, and/or who are on conditional release. The concept of ohana implies engaging consumers in a network of caring relationships that has taken every step possible to ensure that consumers are encouraged to have access to crisis support 24 hours a day, 7 days a week, in recognition of how vulnerable these individuals actually are, and how much difference system response makes between life and death for those who are on the edge. AMHD's efforts to meet the requirements of the Community Plan must be evaluated from this perspective. Concrete tasks and timelines*

*are merely guideposts, not fundamental outcomes. The fundamental outcomes are measured by the systemic organization of the care that individuals with mental illness actually receive.*

## Summary.

      With only six months remaining to achieve full compliance, many complex implementation tasks due prior to the June 30, 2006 date, and several significant areas currently out of compliance, AMHD is under considerable pressure. New members of the leadership team (Dr. Sheehan, Karen Krahn) may be able to help organize fast paced implementation activities that are value driven and quality improvement oriented in order to meet pressing timelines. Certainly, at this visit, my observation is that there is willingness, capability, and motivation to achieve this goal. There is a lot of work ahead, however, and time is short. In addition, there are certain areas, like Forensics, where even more dramatic effort is needed.

      In the following list, I will highlight those areas that are most critical to address to achieve substantial Community Plan compliance by the next visit in June 2006:

## Recommendations:

1. **Organizational structure and function:** **The current organizational structure is out of compliance. The roles of the SAAs, the positioning of the CMHC System Adminstrator, and the relationship of the Forensic Services Director to the rest of the management team all need to be addressed urgently.**

2. **Quality Improvement:** **The Performance Management and Compliance positions must be filled. Quality Improvement must be informed by core values of the Community Plan, as embodied in the proposal to focus on "welcoming". There needs to be a consistent and systematic methodology for sentinel event and performance review that contributes to improvement in system functioning consistent with clinical values.**

3. **Crisis Response:** **The new Crisis Program needs to be implemented with a level of detail and supervision that guarantees that each consumer can easily engender a crisis response with a low threshold for accessing help. In addition, the various crisis response activities of each component of the system need to be coordinated and all staff familiar with the role of each provider that may be relating to their consumers.**

4. **Person Centered Treatment Planning:** **There needs to be an all out effort to translate treatment planning "training" into full scale implementation within a quality improvement framework, and to build the Recovery Vision into concrete clinical practice by all staff. MISA services, forensic services, and crisis planning must be incorporated into treatment plan improvement activities.**

5. **Continuity of Care:** **Current efforts to improve discharge planning are inadequate. There need to be intensive efforts to organize multiple providers involved with each discharge and to closely monitor the client to create a safety net that achieves success.**

6. Conditional Release Programming:  There must be urgent attention to developing conditional release programming, and incorporating this programming into actual treatment plans and treatment interventions.  The roles of the Forensic Coordinators must continue to be defined and developed in order that they may assist in implementing this type of programming proactively and to engage fully in working with consumers and clinicians to ensure success.

7. Housing Stability (Zero Tolerance for Homelessness):  The current "building bridges" program needs to expand into a standard of care for promoting early intervention and more effective wraparound for consumers who are at risk of losing housing, while the availability of appropriately matched housing resources (like "damp" housing) is expanded.

8. ACT and ICM development:  There needs to be an intensive program for training and technical assistance for all ACT providers and ICM providers to ensure that they deliver best practice care in accordance with the service model and service intensity they are designed to provide.

9. Development of Provider Teams in each local system:  Creating models for teamwork between providers to share responsibility for local system design, as in Maui, needs to be a priority for AMHD planning, and for SAA leadership.

10. Development of Functional Leadership Teams in CMHCs and implementation of adequate CMHC staffing to meet the requirements of the Community Plan.

11. MISA Development: The expertise available within the MISA services needs to be organized to be proactively available to assist the development of all the other service components.

12. Medical Oversight:  The Medical Executive Committee needs to continue with its plan to review medically involved sentinel events for quality improvement purposes, to assist in planning for physician leadership in treatment planning and interagency care coordination, as well as for implementation of  HIMAP, including peer education.

13. Effective Utilization Management:  AMHD needs to implement the recommendations of its own consultants to make the UM process clinically driven and clinically valuable.

14. Census Reduction at HSH and Kahi:  The deficiencies in system functioning are resulting in continuing census increases. Efforts to more effectively collaborate with community hospitals, promotion of better crisis services, ACT services, housing supports, and CR programming should emphasize the need to focus on helping HSH discharges not be re-admitted.

15. Provider Relations:  POS provider involvement in the development of quality improvement activities and POS provider partnership with CMHCs in every area are high priorities to insure better collaboration and coordination of care. Further, the voice of providers must be empowered through the Provider Relations Director at the AMHD Executive Team level.

16. Consumer Involvement:  Last, but certainly not least, consumers fundamentally need to be treated as welcomed and empowered partners in service delivery, and as an important source of feedback for whether the system is actually doing what it sets out to do in each of the above areas. This can begin with organized implementation of the "Warm and Welcoming Policy" at the level of every clinician

**in every program.  In addition, there are structures in place (Office of Consumer Affairs, Quality Council, Clubhouse Coalition, etc.) where consumer input is more consistently solicited.  Now that input has to be used effectively in order to actually help AMHD design the system, since AMHD can't get where it needs to go without consumers actively at the design table.**

I am hopeful that this Report provides a clear indication of both what AMHD has accomplished and the challenges it faces at this point in time in order to successfully implement the Community Plan.

As during my previous visits, I have very much enjoyed the opportunity to become involved with the AMHD system of care and am very appreciative of the courtesy, warmth, and openness that have been characteristic of all the participants.  I look forward to observing significant progress in achievement of compliance in my next visit, in June, 2006.

Respectfully submitted,

Kenneth Minkoff, MD