# EXHIBIT

# C

CIVIL NO. 91-00147 DAE-KSC
USA vs. STATE OF HAWAI'I, et. al.
ELEVENTH REPORT AND RECOMMENDATION

Paul G. Gorman Ed.D.
NH-Dartmouth Psychiatric
Research Center
2 Whipple Place Suite 202
Lebanon, NH 03766

January 14, 2006

Magistrate Judge Kevin S.C. Chang
Federal Building
300 Ala Moana Blvd. C-209
Honolulu, Hawaii 96850

Dear Judge Chang:

At your request during the week of December 5, 2005, I participated with my colleagues
Kenneth Minkoff M.D. and Gail Hanson-Mayer in the ongoing evaluation of the Adult
Mental Health Division (AMHD) to determine its progress toward compliance with the
Community Plan (CP) that was issued under District Judge Ezra's order in January 2003.
During the week of December 5, 2005 I met with staff and leadership of AMHD and the
state Department of Health, consumers, family members and providers of clinical
services. A list of these meetings is included in the addenda of the report. There is also
included in the addenda a list of documents reviewed prior to and during g the site visits
as well as the grid, which represents a composite of the observations of the evaluation
team.

This report will be comprised of three major subject areas: AMHD: its functions and
responsibilities as outlined in the Community Plan, the organizations that provide clinical
services, and a summary of the process in which I was involved that followed consumers
through their experience of the service system.

AMHD

The Community Plan (CP) indicated the need for an organizational structure in AMHD to
fulfill its role both of oversight of the system of care as well as its role as a provider of
clinical services. This was to be completed by August 30, 2005. This element still
remains to be completed. During the site visit, it became clear that differing opinions
among the leadership of AMHD existed as to who was and was not a member of the
Executive Team. Within the AMHD Functional Organization Chart that was presented to
the Evaluation Team, there are ten direct reports to the Chief of AMHD as well as
support staff. This places on the Chief a significant supervision challenge for a cluster of
managers whose work is essential to the ongoing development of the service system. In
fact, there seems to be a significant unevenness in the extent and regularity of supervision
being provided to some of these positions. The CP IV.A.3. ii indicates that the reports to
the Chief of AMHD shall be the Consumer Affairs Director; the Service Area
Administrators; the Medical Director; the Administrative Service Officer; and the

Planning and Compliance Director. The CP IV.A.4.ii indicates that the HSH Administrator and the CMHC System Administrator will report to the Chief of AMHD as well. The span of control outlined in the CP is significant in itself.

Since the last visit, several significant leadership positions have been filled, e.g. the Medical Director, the Chief of Clinical Operations (not part of the CP), and the Quality Management Position. However, the administrator of Hawaii State Hospital (HSH) remains a vacant position. This critical position needs to be filled especially in light of the pressure that the present HSH census is bringing to that organization. These new leaders in the organization will bring a new and different perspective to the challenge that continues for AMHD as it brings the community system into compliance with the CP. I look forward at out next visit to assess the impact of their skills on the completion of the tasks that remain to be addressed in the implementation of the CP.

At the core of the CP is the conviction that the community system needs to see itself as constantly in the process of improving the quality of the clinical services that are available to consumers and families. In accomplishing that goal, the AMHD positions that oversee Performance Management and Compliance need to be filled as soon as possible. The guiding principles of the CP are clearly stated in the CP in I, Introduction and Guiding Principles: A, B, and C.  In that statement the underlying philosophy of hope, mutual responsibility, and recovery are defined. These principles need to be the core of the Performance Improvement activity of AMHD. The Quality Council is improving in its ability to provide oversight and leadership to this process in the community system. AMHD, however, still needs to assemble an operative team that will both identify the elements of the quality improvement agenda and move those elements forward. The QIC needs to become more active and act through an executive committee structure. The present QIC is to large to make the quality agenda a regular part of the daily working life of AMHD.

The CP plan states in IV.A.2: " AMHD shall be organized to separate its oversight functions from its provider functions." The CMHC system presents a unique challenge in management to AMHD since the CMHC system is both part of the state structure as well as a provider of services. As a provider of services the CMHC system is no different than the POS organizations. Both of these organizational entities need to be treated in the same way with the same cluster of expectations/responsibilities for the service of the consumer/family community. AMHD needs to address this issue and develop a structure that oversees all providers in the same manner.

The responsibilities of the Consumer Affairs Director are outlined in the CP: IV.A.3.b i,ii,iii.  I want to comment on two areas of the responsibilities of this position: iii.b and iii.k. iii.b states that the Consumer Affairs Director will 'establish a training and certification process for peer specialists.' The Peer Specialist program is an especially innovative programmatic development. Since July of '03, there have been training opportunities for consumers. Presently, there are 47 people who have been certified as peer specialists. The POS organizations and HSH have moved ahead and employed some of these consumers for specific tasks in their organizations. The CMHC's, however, have

been slow to incorporate these individuals in their staffing pattern. At present there are two positions at each CMHC designated for peer specialists. They need to be filled as soon as possible before the certified consumers find other occupations with which to become involved. Related to this hiring process is the question of space availability at the CMHCs. The space challenge has been referenced in previous reports. It continues to be an impediment to implementing elements of the CP.

iii.k states that the Director of Consumer Affairs is 'to assist consumers in resolving complaints about access to and quality of AMHD funded services.' The Director's Office has a comprehensive process that is followed to address consumer complaints. The staff there works diligently to accomplish this very serious responsibility. At times, however, given the nature of the complaint, the decision may be made to refer the complaint to another review process in the state structure. There needs to be a process in place that ensures that the outcome of that complaint resolution process is made known to the Office of Consumer Affairs.

Another area of responsibility of the Office of Consumer Affairs involves relating to consumer and family advocacy groups. In the course of this visit, meetings were held with advocacy groups as well as with the Quality Improvement Council. There were several issues raised at these meetings. Among the advocates there is a wide spectrum of opinion regarding the quality and accessibility of services for families and consumers. The issues that were raised involved concerns about the Psychosocial Rehab Programs (PSR) and Club Houses in the system. These are issues that have been raised to the evaluation team in the past. AMHD has proposed to make some changes in the structure of these programs. From the consumers perspective this is perceived as an effort to interfere with what consumers feel is a very helpful program. While the issues involved here are complex, AMHD's management of these changes have left many in the consumer community feeling disenfranchised. This is unfortunate since AMHD has made strides in the area of consumer services, e.g. peer specialists program mentioned above, but has been unable to adequately communicate with the consumers around the planning and implementation process of the PSR and Club House programs. The implementation of the PSR and Club House programs has not met the Community Plan's timeline (due date of 11/30/05).

An issue that has been continuously raised is the need for continuity in Case Management for consumers. In part, this issue will be addressed as the system moves to a blended case management model. This issue is made more problematic due to the large turnover in case management staff across the system. It is clear, as will be discussed later in this report, that case management services are the foundation stone of this and most other public mental health system models. Given that fact, there is a significant issue in the lack of realization of the CP's standard for case management ratios in the CMHC's. Advances have been made in meeting the ratios identified in the CP for Case Management although further work needs to be done to meet the designated timeline of April 30, 2006.

The functions and responsibilities of the Service Area Administrators are addressed in the CP in section IV.A.3.c.i-iii. Section IV.A.3.ii states: 'the SAA shall have the authority and responsibility to ensure that AMHD oversight functions are effectively carried out with all AMHD funded services in the SAA's service area. ' The importance of the contribution of the SAAs to the successful implementation of the CP cannot be overstated. These administrators are the individuals who identify and work through the barriers that prevent successful implementation of the CP in their regions. They need the recognized authority that will enable them to bring providers together, both the POS organizations and the CMHC's, to develop solutions to issues that present themselves in the CP implementation. Their challenge is to be sure that there is a system operating in their region in fact as well as in plan. They need to assure that the consumer experiences a seamless system of care despite the fact that there maybe multiple provider organizations involved in the clinical interventions for the consumer/family. During the evaluation team's recent visits, these positions have been in flux regarding their place in the AMHD's organizational structure as well as their span of responsibility. A vacancy is being filled among the SAA and another position will soon become vacant because of retirement. With the appointment of the new Chief of Clinical Operations, the recruitment issues as well as the span of responsibility issues and associated authority raised above can be directly addressed.

The Utilization Management (UM) function has been under review and change since the last visit. A study of the UM functions has been made with associated recommendations. A work plan to implement those recommendations needs to be put in place. New staff have been hired and UM functions have been moved from Access to the revised UM structure. The UM leadership is moving toward a more efficient and less complex authorization process. There is also the intent to have UM staff work more closely with providers including regular provider site visits. These are all positive developments. Two other areas that have been identified for improvement are the AMHD oversight of Kahi Mohala and HSH as well as the need to have the same oversight functions operative in the CMHC's and the POS organizations. These improvement initiatives are critical for the continuity of care of the consumers that has been such an elusive goal to achieve in this system development. Despite these positive accomplishments and establishment of goals, the fact is that the UM system still does not reflect the expectations set forth in the CP. There is still a distance to go before the UM process of authorization really promotes continuity of care and not just permission to provide service.

The Office of Cultural Affairs has developed several initiatives since the last site visit. There has been appointed an advisory committee to work with the AMHD coordinator of multicultural affairs. A plan of action has been developed which is now available on line. A regular feature of the AMHD Newsletter is 'Dialogue on Diversity. There has been established at Hawaii State Hospital (HSH) an annual cultural fair as well as regular quarterly trainings in which staff must participate. At present this office is involved in doing a needs assessment at all of the CMHCs, which will need to a training plan for the staffs of those centers. Given the cultural diversity of Hawaii, all of these initiatives will help providers consider the cultural background of the consumer and family as they build positive clinical relationships with them.

Since the last site visit, a Provider Relations Director has been appointed. A provider survey has been completed and the results are being analyzed. The POS leadership, however, continues to feel that their relationship with AMHD is characterized more by an adversarial quality than by a partnership of people committed to providing quality clinical care to consumers and families. The AMHD community service system is complex. There are a variety of different providers bringing clinical care to the consumer. The need for planning and regular, indeed daily, communication in this system of multiple providers is essential. AMHD's oversight function with all providers needs to build and enhance these processes. Hospitals and the array of community providers need to be brought together into a real system that serves the consumer. Some of the current management structures noted above e.g. the seperation of the non-profits and CMHC systems militate against the realization of a cluster of providers who work together. Work on this issue is essential if the care consumers receive is going to be coordinated and integrated. The CP speaks to the importance of AMHD developing and nurturing a positive working relationship with all providers. Given the information received at this site visit, AMHD has not achieved this goal which expected completion date was August 1, 2005.

## CLINICAL SERVICES

### Case Management/CMHC Management Structure

The CMHC's are involved in two major change initiatives: redefinition of case management care and management/leadership process development. The first issue: change in the case management model to a blended case management model will address, in part, the issue of continuity of care experienced by consumers of the service system. This is a critical issue that has been brought to the attention of the evaluation team on several occasions by consumers and family members. This new model not only addresses the continuity of care issue but also acknowledges the changes that develop in a consumer's profile over time. As this change takes place, it places stress on staff to learn a new approach to the work that they have been doing. It is also raising the issue of night and weekend coverage. Staff and management are addressing these issues in a positive manner. The case management service system continues to struggle with a variety of factors that leave this service out of compliance with the CP. The ratios identified in the CP are still not being met consistently across the system. Recruitment is slow. The case managers who are working within the system often work in very limited space without the use of reasonable tools for their work, such as cell phones. It is interesting to note that the case management coordinators with whom the evaluation met were basically uninformed about any of the details of the new crisis management system. Although this system was introduced the week before the evaluation team arrived, the fact that these leaders of the case management service across the system were uninformed of the way in which this new system would operate indicates a significant lack of communication within AMHD and the CMHC system regarding a critical dimension of the service system.

The CMHC's are in the process of implementing a new management structure. Here, as in the case management system, there was evident a lack of communication and understanding of this new initiative. The areas of responsibility of the Clinic Director and the Medical Director need more refinement. The way in which these two principal leadership positions interact with other members of the CMHC team also needs to be more carefully articulated. The CMHC system still has management issues at both Diamond Head and Windward. While the issues at Diamond Head are scheduled to be resolved in January of '06, the issues at Windward still demand a comprehensive solution that brings the management issues there to a conclusion. The CMHC administrator is carrying multiple responsibilities which makes it difficult to focus on resolving outstanding management challenges while trying to implement a new management structure across the entire system.

These projects i.e. case management / CMHC management structure will be reviewed for compliance with the CP at the next site visit in June 2006.

Crisis Services

At the time of the site visit, AMHD had announced that the statewide crisis service delivery contract had just been awarded to Care Hawaii. The first issue that became quickly apparent was how little the providers who were going to be impacted by this development knew about the way in which this new system was going to operate. AMHD staff is aware of this issue and were actively working to address it. In addition, there is a quality monitoring process being developed to oversee the performance of the contractor and sub contractors in this program.

The provision of effective crisis services state wide in an integrated system has been a challenge that has eluded AMHD in the past. The results have, in part, been at the root cause of some of the sentinel events that the system has experienced. Essential to this system is both ongoing, regular clinical oversight and review as well as a process that assures that complete clinical information moves through the system's interventions during the crisis to assure the consumer positive outcomes. The CP anticipates that each consumer will participate in the development of a crisis plan for his or her care. Such plans were not regularly a part of the Medical Record I reviewed. All of these issues are known and are being worked on by AMHD staff. Implementation of the statewide crisis program with the associated challenges mentioned above will demand a tremendous amount of effort by AMHD in the next 4 ½ months.

Assertive Community Treatment (ACT)

Since the last site visit, there has been a very effective training and technical assistance initiative that has been developed for the ACT providers by AMHD. This training has followed site evaluations of ACT providers and was designed to address the issues that process identified. AMHD has recognized that the reimbursement structure for ACT needs to be adjusted such that it encourages a faithful reflection of the ACT model. The

result of this training, which is still underway, is recognition by the ACT teams of what it means to be a team and the implications of that realization both for clinical practice and organization of service delivery. These are positive developments in the early phases of development. It remains to be seen whether these changes ca become the default mode of operation for ACT in the future.

Providers of Care for the Homeless

The service system has a very competent group of providers of care for consumers who are homeless. In general they indicated that their experience with the crisis system was a good one. They are able to be in contact with crisis services without the intermediary of the Access process which is very helpful to them. They indicated the need for both staff of AMHD and other providers of care to understand what it means to be homeless. Training to increase understanding in this regard would be very useful. Three critical areas which were raised in a meeting with the homeless provider organizations were: access to medication for consumers, more rapid access to case management services, and the need for case managers once assigned to maintain contact with the homeless person over the long term. AMHD needs to address these issues quickly in the service of the homeless consumers.

CONSUMER TRACKING

Given the number of providers who are involved with services to consumers in the community system and given the need for clear communication between these providers to assure coordinated care for consumers, a series of consumers who are members of the target population were tracked in their current course of care. This was done in an effort to evaluate the effectiveness of the CP implementation. Meetings were held on site with both hospital and community providers who had been involved in the course of treatment of these individuals in their most recent episode of care. The following is a brief summary of these consumers' care experience and conclusions for the system as it develops.

Case # █████████

In the most recent episode of care, this consumer has received care from Helping Hands Hawaii (HHH), Kahi Mohala (KM), and Po'ailani, Inc. (P). The consumer is a person with a history of mental illness and substance abuse. She has resided with her mother most recently. She has a daughter who is being cared for by the consumer's mother. The consumer is a CNA who has worked in that capacity during the past year. She had an admission to KM in May of 2005. In September of '05, she was discharged from KM to P Specialized Residential Treatment and HHH case management services where she had been receiving services since 1999. Because of threatening statements made both to staff and residents of P, she was readmitted through the Emergency Room (ER) of Castle to KM where she continues to be treated.

Systemic issues presented by this case:

1. When a consumer begins to decompensate, the case manager needs to be involved immediately. There needs to be a rapid response to this request by a housing provider.
2. The case management provider needs to be frequently involved with the consumer when they are in a specialized residential program.
3. The most current inpatient medical record needs to be available to a housing provider and/or the case management provider.
4. Housing providers need more training in addressing behaviors of consumers who are decompensating.

One of the core elements of the CP is an active engaged case management system. The availability and involvement of a case manager in the care of a consumer is essential. To ensure continuity of care, it is in large measure the case manager who is the bearer of that information from clinical provider to clinical provider. The ability of the system to assure this information transfer is essential to the quality of care that a consumer receives.

Case # ▮▮▮▮▮▮▮▮▮▮

This consumer has a history of homelessness, eloping from group home settings, and living from time to time at a hostel. He is receiving care from CARE Hawaii ACT, Queens Medical Center and KH. He has a long history of mental illness and a history of suicide attempts. He was discharged in June from KM to a motel. He declined to accept a referral either to a group home or a care home. While at the motel he overdosed on his medication and was taken to Queens by his case manager. After treatment at Queens, he was transferred to KM . After a course of treatment, he was discharged and followed by case management services in the community. Subsequently, he attempted suicide again by jumping off a building. He was again taken to Queens, treated, and transferred to KM where, at the time of this site visit, he continues to be treated. His Care Hawaii ACT Team has had significant and frequent contacts with him both in the community as well as during his recent hospitalizations.

Systemic issues presented by this case:

1. The consumer did not have a crisis plan in his medical record. As noted earlier in this report, this is an expectation of the CP. This intervention can be very useful in engaging a consumer in an active way in their treatment process. The crisis planning expectation is not due until February 2006. This experience and other cases reviewed suggests that this critical issue has a significant distance to travel for compliance with the CP.
2. This particular consumer presents unique challenges to the system. In particular, he has demonstrated, by his behavior, a significant intent to commit suicide. AMHD needs to develop a plan to address the obvious threat that this consumer presents. In addition, this consumer points to the need that AMHD has of providing unique housing opportunities for a person who presents with the challenges that are presented by this consumer.

Case # ████████

The consumer has a long history of mental illness and hospitalizations. During 2005 he received care in the Samuel Mahelona Hospital, Care Hawaii ICM, Po'ailani 24 hr Therapeutic Housing, Windward Clinic, Castle Emergency Room, and HSH. His first hospitalization this year at Mahelona Hospital was as a result of threatening statements. This person does have a history of violent behavior. His recent hospitalization at HSH was also a result of threatening statements. The challenge of conveying current information between all of these providers was evident in the care of this person. Challenging also was the consumers demand for reduction and change in medication and the prescribing physician's limited knowledge of the clinical history of the consumer.

Systemic Issues presented in this case:

1.  A person with a long history of severe mental illness as well as a remarkable repeated pattern of behaviors was placed in the position of receiving and negotiating care from six different providers in a year. The need that there be one person who is responsible for conveying the history and present status of this person to all providers is self-evident.
2.  The need for forensic services for this individual given his history is evident. However, the forensic services that he did receive were disconnected one from the other. This was unfortunate since the services in themselves were well done and could have built on one another.

## SUMMARY

The challenge for AMHD is to bring the community system into substantial compliance in six month. This will demand very significant and coordinated effort on the part of the AMHD staff as well as the provider community. There are significant issues that have been outlined above e.g. case management development and CMHC management structure, which are scheduled for completion in the new CP timelines between now and the next site visit. The following are the major considerations that need to be addressed if AMHD is going to be able to achieve compliance in six months:

Organization Structure: AMHD needs to stand back and, develop an organizational structure that will enable it to achieve its goal of compliance with the CP. Among other considerations, this will involve addressing the position of SAA's in the system, the common oversight responsibility of AMHD of all providers i.e. POS, CMHCs, and hospitals and other issues mentioned above.

Housing: while the housing continuum has been expanded, its capacity needs to be significantly expanded. This is especially true of housing options for people being discharged from hospitalization. There needs to be more flexibility in the system e.g. allowing case management/ACT to be assigned to people in LSR housing.

Hospitalization: the census at HSH is higher now than it has been anytime in the last several years. This is a significant issue and points to the need for more 'step down' housing options for consumers.

ACT Teams are central to the CP's vision of the service system. Training and TA opportunities have helped to move this service forward. These interventions need to be continued to assure the ACT process continues to develop as the model intends.

The transition now underway in Case Management needs to be strengthened and brought to conclusion in the CMHCs.

Knowledge of the new statewide crisis response model needs to be disseminated and its implementation completed.

The coordination of care and the flow of information needed to assure that coordination needs to be addressed and the systems put in place that will ensure this coordination of care as a predictable component of the service system.

The providers in regions across the state need to be brought together in a way that will assure for the consumer and families that they will be inter facing with an integrated system of care and not independent, fragmented elements of a care structure.

I appreciate the opportunity to continue to work for you in your efforts to ensure a mental health system of care for the people of Hawaii of which all the stakeholders can be proud. I also want you to know how very grateful I am to the staffs of AMHD and the provider community who continue to welcome me and extend every courtesy to me.

Respectfully Submitted,

Paul G. Gorman Ed.D.

Staff Interview and Meetings
Dec. 5-9, 2005, Visit

1. AMHD Director
2. AMHD Medical Director
3. AMHD Chief of Clinical Operations
4. Executive Team
5. Coordinator of Multi-Cultural Services
6. CMHC System Administrator
7. Quality Improvement Administrator
8. Queen's Medical Center Coordination Group
9. Chief, Crisis Services
10. Chief, Utilization Management
11. Consumer/Family Advocate Group
12. Chief/Staff Office of Consumer Affairs
13. POS Providers
14. AMHD Oversight Committee: HSH/Kahi Mohala
15. Recovery Planning Work Group
16. Kahi/Mohala Treatment Team
17. Helping Hands Hawaii Treatment Team
18. Care Hawaii Treatment Team
19. Case Management Coordinators
20. CMHC Directors
21. Homeless/Crisis Services Leadership
22. Crisis Services Work Group
23. Dr. Fukino
24. Oahu Service Area Administrator
25. Po'ailani Residential Program
26. Medical Director/Windward CMHC
27. Psychiatric Staff at Castle Medical Center
28. Psychiatric Staff at Queen's Medical Center
29. Conference all with Waiamai Clinic
30. Service Area Administrator
31. Quality Council
32. Quality Improvement Committee
33. Quality Care Work Group

**Document Review**
December 5 – 9, 2005

1. All minutes of the Executive Team, MSN, and Daily Report for the period from July 1 to the December visit.
2. All minutes of QIC, and all related QI activities, including MSN work teams.
3. All minutes of meetings with AMHD leadership and POS providers. Documentation of efforts to create a partnership between AMHD and the provider system.
4. Documentation of employee review processes in AMHD senior management and at senior management CMHC's.
5. Documentation of consumer protection activities, not related to sentinel events.
6. Complete roster of all provider and consumer complaints, including documentation of reviews and follow up improvement activities.
7. Documentation of data or reports collected by the Service Directors regarding any monitoring the outcome of their plans or assessing the needs in their areas.
8. Documentation of changes in ACCESS, documentation of how improvement in crisis services at the consumer level is being identified and monitored.
9. Documentation of all activities related to improvement of ACT functioning, including evidence of fidelity monitoring, and continuity of care.
10. Meeting minutes for the last three moths of the CMHC Leadership Teams and CMHC directors.
11. All meetings involving Case management supervisors, including descriptions of their jobs and activities, including clinical case loads.
12. Any new CMHC policy development since June 2005
13. All data in the last six months addressing case load requirements for POS and CMHC case managers, including actual case load data and plans to address shortfalls regarding Community Plan requirements.
14. Minutes of staff meetings in the CMHC'.
15. An overview of the Community Plan Target Population and Target Population Report, including all efforts to identify subpopulations.
16. Data reports used in QI monitoring of adverse outcomes.
17. Data monitoring timely access to initial assessment. Documentation of elimination of two-step assessment process in all CMHC's.
18. Target population list by current location in Discharged, Diverted and Transferred categories, including list of service authorizations.
19. Most recent AMHD QM plan and documentation of all meetings regarding implementation of QM philosophy and QM activities.
20. Comprehensive report on all activities in the past six months undertaken by Quality Management regarding developing and implementing collaborative monitoring of POS providers. Any similar activities regarding AMHD community providers. Any similar activities in the past three months regarding inpatient services, including HSH.
21. Comprehensive report on all QM activities by AMHD regarding treatment planning. Any similar activities at the SAA or CMHC level.

22. Monthly reports from Dr. Koyanagi and any evidence of how these reports are used by AMHD in internal QM.

23. Current status of Dr. Weiner's proposal for Clinical Oversight, and evidence of follow up.

24. AMHC Compliance Reports on Policy Development.

25. Minutes of three months of meetings of service area planning boards, state mental health planning council.

26. Documentation of community case managers' attendance at HSH/Kahi discharge meetings, and documentation of continued Performance Improvement efforts.

27. Updated MOU and DD Services.

28. Any reports provided by Consumer Affairs director. Meetings with consumer advocates, etc.

29. Documentation of clubhouse development and monitoring.

Record Review



DTD Group

